Genoa M. WHITE, Appellant,

v.

UNITED STATES of America.

No. 84–5645.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 18, 1985.

Decided Jan. 3, 1986.

98

Malcolm W. Houston, Kensington, Md., for appellant.

Michael J. Ryan, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before WRIGHT and EDWARDS, Circuit Judges, and DAVIS,* Circuit Judge, United States Court of Appeals for the Federal Circuit.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge.

This case arises under the Federal Tort Claims Act and involves appellant's claim for damages for injuries suffered when she was attacked and brutally stabbed by a

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

psychiatric patient from St. Elizabeths Hospital.

On December 7, 1979, Dwayne White, a patient confined to St. Elizabeths Hospital ("St. Elizabeths" or "Hospital") by court order after acquittal of murder by reason of insanity, left the Hospital grounds and repeatedly stabbed his wife, Genoa White, with a pair of scissors. At the time of the attack, Dwayne White had "grounds privileges," permitting him to go anywhere on the Hospital premises from nine in the morning until nine at night. Although these privileges did not include permission for White to leave the Hospital grounds, at least three Hospital exits are open for access; by the Hospital's own admission, St. Elizabeths is not an entirely secure facility.

Genoa White, the appellant in this case, brought a Federal Tort Claims Act action against St. Elizabeths alleging two separate theories of liability. First, she alleged that, although Dwayne White had related a fantasy about harming her to a Hospital psychotherapist, the Hospital failed to warn her of this threat, thereby breaching an alleged duty to her. Second, she claimed that the Hospital was negligent in failing to take the reasonable precautions necessary to ensure that Dwayne White did not leave Hospital grounds. After a bench trial, the District Court found that Dwayne White's psychotherapist was acting within professional standards of competence in concluding that Dwayne White's fantasy did not represent a threat to appellant. The District Court further concluded that the Hospital had not been negligent in granting Dwayne White unsupervised access to the Hospital grounds because it was not foreseeable that he would leave the institution and attack his wife.

After careful scrutiny of the record in this case, we uphold the judgment of the District Court finding that the Hospital did not violate its duty to warn Genoa White of Dwayne White's threats against her. However, we hold that the judgment of the District Court was clearly erroneous in finding that the Hospital was not negligent in failing to supervise White so that he remained confined to its grounds. St. Elizabeths was obligated by the D.C.Code and by court order to keep Dwayne White confined to Hospital premises; the failure to confine an admittedly dangerous psychiatric patient constituted negligence in this case. Additionally, Hospital officials had every reason to know that Dwayne White was routinely leaving the Hospital grounds to visit his wife; consequently, the failure to take steps to prevent White's departures is legally inexcusable. We therefore reverse the judgment of the District Court and remand for consideration of the Hospital's affirmative defenses.

## I. BACKGROUND

Dwayne White was first admitted to St. Elizabeths Hospital on February 8, 1968 at the age of 18. Medical staff at St. Elizabeths consistently have diagnosed him as an "explosive personality" who will become uncontrollably violent if his low tolerance for frustration is exceeded. This diagnosis is confirmed by an examination of his Hospital records, which are replete with examples of assaults and other violent behavior. Indeed, within months of his original admission to the Hospital, Dwayne White attacked five police officers who were attempting to arrest his father and, in the ensuing struggle, killed one officer. Charged with the police officer's murder, White was found not guilty by reason of insanity and ordered by the District Court to remain at St. Elizabeths. As a result of this acquittal, White must remain at the Hospital until the District Court determines that he no longer presents a danger to himself or others. For ten years following this incident, Dwayne White remained a patient at St. Elizabeths and his violent behavior continued, including numerous assaults on fellow patients and ward staff, an assault and robbery attempt against a cab driver while on unauthorized leave in 1971, and a second assault on several police officers in August 1978.

In mid-1978, the Hospital decided to grant Dwayne White limited grounds privi-

leges [1] that were to be increased on a gradual basis. In May 1978, he was granted the privilege to walk unaccompanied to and from his therapy sessions with telephone checks to ensure his arrival. Later that same month, these privileges were increased to include one hour of unaccompanied grounds privileges. After the August 1, 1978 altercation with police, Dwayne White's ground privileges were suspended temporarily, but the Hospital restored these privileges—in full—three weeks later. The Hospital increased the duration of his unaccompanied privileges to two hours per day in September 1978, and to four hours per day in March 1979. Finally, in September 1979, the Hospital granted Dwayne White "9 a.m. to 9 p.m." grounds privileges. Although he was required to report for meals, work and industrial therapy, at the time of the assault on his wife, he had most of his afternoon free.

Dwayne White met appellant sometime in 1978 while she was a patient at St. Elizabeths and married her several months later on March 10, 1979, at a church off the Hospital grounds. At the time of the marriage, Genoa White was no longer a patient at the Hospital. Although the Hospital records suggest that the staff knew that Genoa White was Dwayne White's "girl friend," the staff was not aware of the marriage until June 1979. According to both Dwayne White and his wife, he left the Hospital grounds to visit appellant at her home on a routine basis.

From 1977 to January 1980, Dwayne White had weekly individual psychotherapy sessions with Dr. Lorraine Brown, a clinical psychologist employed by the Hospital. Under a Hospital policy known as the "therapist-administrator split" ("T/A split"), Dr. Brown did not participate in administrative decisions concerning Dwayne White's treatment. The purpose of the T/A split is to keep individual psychotherapy independent of regular treatment in order to ensure a trusting relationship between the therapist and the patient. Sometime in June 1979, Dwayne White related a fantasy to Dr. Brown in which he harmed his wife with a gun. Although Dr. Brown and Dwayne White discussed this fantasy on several occasions, Dr. Brown never disclosed the fantasy to the Hospital administrators or to Genoa White. According to Dr. Brown, she did not consider the fantasy to be a threat to Genoa White because Dwayne White talked about his fantasy as a *fantasy* and he was not afraid that he would act upon it. Furthermore, Dr. Brown did not view the fantasy as presenting a real threat to Genoa White because Dwayne White had no history of assaulting women and had not assaulted anyone in recent months.

Dwayne White's assault on appellant occurred almost six months later, on December 7, 1979. White had attended a court proceeding that morning in District Court concerning his request for a conditional release to his sister's custody during the upcoming Christmas holiday. A similar request for a conditional release had been denied by the District Court in February 1979. On a few occasions in the past, court appearances had been very stressful to White, but the Hospital staff testified that they detected little stress in connection with this particular court appearance. After the December 7 hearing was postponed because an attorney failed to appear, Dwayne White returned to the Hospital, and that afternoon left the Hospital grounds to visit his wife. Before this visit, Genoa White had been drinking with a friend. She testified that her husband was very upset by the court proceedings and was pessimistic about the likelihood of receiving a conditional release. Later that

---

1. "Grounds Privileges" permit a patient to leave the ward and go anywhere on the 320 acre hospital grounds. Although patients with grounds privileges are not permitted to leave the Hospital grounds, at least three of the five Hospital exists are open for access and persons are not stopped as they leave Hospital grounds. According to the Hospital, security at St. Elizabeths exists is "primarily for the purpose of protecting patients and staff from unauthorized intruders" and the Hospital "is not a penal facility and is not, therefore a secure facility." Defendant's Answers to Plaintiff's First Interrogatories, Record Document No. 66, at 25.

afternoon, Genoa White left the apartment to visit a friend and returned around seven o'clock. Upon her return, she was surprised to find her husband still at the apartment. Because he said that he needed carfare for the return trip to St. Elizabeths, appellant went to a friend's house to borrow money. After drinking at her friend's house, Genoa White returned to the apartment, and soon after her arrival showed her husband pictures of herself dressed in a bathing suit and kimono and of a male wearing boxer trunks. When she turned her back, Dwayne White picked up a pair of scissors, and repeatedly stabbed her, inflicting 55 wounds. At a subsequent criminal trial for the assault of his wife, Dwayne White claimed insanity as a defense, but was convicted of assault with intent to kill appellant.

## II. ANALYSIS

### A. *The Hospital's Duty to Warn*

The appellant's first claim is that the Hospital had a duty to warn her that Dwayne White harbored hostility toward her and therefore posed a threat to her safety. In particular, it is appellant's view that Dwayne White's fantasy of harming his wife with a gun was a genuine threat that should have been relayed to the Hospital Administration and to appellant after her husband told Dr. Brown about the fantasy.

The duty to warn foreseeable victims of mental patients originated in *Tarasoff v. Regents of the University of California.*[2] In that case, the California Supreme Court held that the special relationship between a patient and a psychotherapist creates a duty to third persons. When a psychotherapist determines—or under the standards of the profession should have determined—that a patient presents a serious danger of violence to another, the psychotherapist "bears a duty to exercise reasonable care to protect the foreseeable victim of that danger."[3] As in *Tarasoff* itself, this duty will often include an obligation to warn the intended victim, but only if the victim is identifiable.[4]

The *Tarasoff* rule has been followed in a number of jurisdictions, and in at least one decision this court has upheld a similar duty to warn against the District of Columbia.[5] The trial in this case apparently proceeded on the assumption that the appellees owed a duty to warn; we have no reason to doubt the validity of that assumption.

In defining the duty to warn, the courts have made it clear that the duty is not triggered by the mere existence of a threatening statement by a patient to his psychotherapist. "Such statements are commonly expressed to psychiatrists and merely pose but do not answer the difficult question of whether or not danger is actually present."[6] Before a hospital or psychotherapist incurs an obligation to warn, the patient must present a "serious danger of violence" to a "foreseeable victim of that danger."[7] Furthermore, in determining whether the Hospital should have warned appellant, this court must focus on whether Dr. Brown's handling of the fantasy was consistent with the standards of her profession. As the *Tarasoff* court noted:

> Obviously we do not require that the therapist, in making [the determination of dangerousness], render a perfect performance; the therapist need only exercise "that reasonable degree of skill,

---

2. 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976).

3. *Tarasoff,* 131 Cal.Rptr. at 25, 551 P.2d at 345.

4. *See, e.g., Brady v. Hopper,* 570 F.Supp. 1333 (D.Colo.1983), *aff'd,* 751 F.2d 329 (10th Cir. 1984); *Thompson v. County of Alameda,* 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980).

5. *See Rieser v. District of Columbia,* 563 F.2d 462, 479 (D.C.Cir.1977) (applying similar duty to warn to decision to parole a dangerous sex-offender), *modified on other grounds en banc,* 580 F.2d 647 (1978).

6. *Doyle v. United States,* 530 F.Supp. 1278, 1289 (C.D.Cal.1982).

7. *Tarasoff,* 131 Cal.Rptr. 25, 551 P.2d at 345.

knowledge, and care ordinarily possessed and exercised by members of [that professional specialty] under similar circumstances." [8]

In sum, we must determine whether Dr. Brown exercised the reasonable skill, knowledge and care ordinarily possessed by members of her profession when she concluded that the fantasy reflected no danger to Genoa White.

■ We conclude that the District Court's finding that Dr. Brown's assessment of the fantasy was reasonable is not clearly erroneous. Dr. Brown gave a detailed and persuasive explanation of why the single fantasy did not reflect a danger to Genoa White. She testified that she considered the fact that Dwayne White himself recognized these thoughts as a fantasy and that he was able to distinguish between fantasy and acting on his fantasy. Additionally, she noted that Dwayne White had not had any violent incidents for close to a year and had no history of assaulting women. Dr. Brown's testimony was buttressed by Dr. Miller, the Hospital's expert witness, who concluded that Dr. Brown's assessment was a reasonable one under the standards of her profession. He further testified that, as Dwayne White's psychotherapist, Dr. Brown was in the best position to assess the fantasy. Although Dr. Madsen, a member of the Hospital staff who conducted an evaluation of Dwayne White in the fall of 1979, testified that he would have strongly lobbied for a restriction of privileges had he known about the fantasy at the time of the testing,[9] his knowledge of the fantasy was only second-hand and thus his testimony is not otherwise sufficient to overcome Dr. Miller's testimony that Dr. Brown's assessment was reasonable.[10]

We also reject appellant's suggestion that the T/A split policy was itself an unreasonable practice. Although Dr. Blumberg, the appellant's expert, testified that the use of the T/A split is a "ludicrous" practice in a maximum security setting, we hesitate to second-guess the wisdom of an essentially medical decision in the face of ample evidence in the record that a T/A split is a common practice at similar institutions. Dr. Miller testified that the T/A split "as performed at St. E's Hospital is consistent with the usual and appropriate practice of individual psychotherapy in an institutional setting" and noted that the T/A split was used at other institutions including Yale, Connecticut Mental Health Center and Westhaven Veterans Administration Hospital.[11]

In summary, although St. Elizabeths may be obligated to take reasonable steps—including warnings—to protect foreseeable and identifiable victims from a serious danger of violence presented by its patients, Dwayne White's fantasy presented no such danger to Genoa White.

### B. *Negligence*

Appellant's second contention is that the Hospital was negligent in its supervision and confinement of Dwayne White. As with any negligence claim, liability requires:

> (1) a duty, owed by the defendant to the plaintiff, to conform to a certain standard of care; (2) a breach of this duty by the defendant; and (3) an injury to the plaintiff proximately caused by the defendant's breach.[12]

### 1. *The Duty and Standard of Care*

■ The initial question before us is whether St. Elizabeths owed a duty to ap-

---

**8.** 131 Cal.Rptr. at 25, 551 P.2d at 345 (quoting *Bardessono v. Michels,* 3 Cal.3d 780, 788, 91 Cal.Rptr. 760, 764, 478 P.2d 480, 484 (1970)); *see also Hicks v. United States,* 511 F.2d 407, 417 (D.C.Cir.1975).

**9.** Transcript ("Tr.") at 199.

**10.** Dr. Madsen's testimony, however, does reinforce the conclusion that White was viewed by Hospital staff as extremely dangerous.

**11.** Tr. at 548–50.

**12.** *Morgan v. District of Columbia,* 449 A.2d 1102, 1108 (D.C.1982), *vacated on other grounds,* 468 A.2d 1306 (D.C.1983) (en banc).

pellant. On this point, our inquiry is made easy by well-established principles of tort law and by specific provisions of the D.C. Code. It is well-recognized that institutions, such as prisons and mental hospitals, that have custody over dangerous persons have a duty to members of the public to exercise reasonable care to control their inmates or patients. In this regard, section 319 of RESTATEMENT (SECOND) OF TORTS (1965) provides:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.[13]

Thus, as the custodial ward of criminally insane patients, St. Elizabeths assumes a duty to take a reasonable care to prevent harm to others.[14] As we have previously noted,

> [b]y reason of its nature as a public institution St. Elizabeths Hospital owes a duty to the public in carrying out its difficult responsibilities.[15]
>
> ....
>
> Unless persons injured by the hospital's failure to properly perform its functions can recover for their injury, society's ability to insure that the hospital conscientiously performs its duties is rendered haphazard at best.[16]

In the instant case, as part of this duty to protect the public, St. Elizabeths was obligated to take steps to prevent the escape of its dangerous patients;[17] and appellant, who was injured by virtue of White's unauthorized leave, could properly seek recovery for a breach of this duty by the Hospital.

The District Court was of the view that St. Elizabeths was not negligent because the Hospital could not have reasonably foreseen that Dwayne White would harm his wife. This line of reasoning, however, is precluded in this case by the D.C. Code, which creates a *presumption of dangerousness* that remains for the duration of White's mandated confinement at St. Elizabeths. Dwayne White was committed to St. Elizabeths after his acquittal by reason of insanity and, therefore, under D.C.Code § 24–301(e), White could not leave Hospital grounds until the Superintendent of St. Elizabeths certified that he "ha[d] recovered his sanity" and "will not in the reasonable future be dangerous to himself or others," *and* the District Court agreed with the Hospital's assessment.[18] Even conditional releases of patients such as Dwayne White must be approved by the court.[19] Indeed, in February 1979, the District Court had refused to grant Dwayne White even a *conditional* release for only *one day* to visit his sister's house.

**13.** RESTATEMENT (SECOND) OF TORTS § 319 (1965). Illustration 2 under section 319 is analogous to this case:

> 2. A operates a private sanitorium for the insane. Through the negligence of the guards employed by A, B, a homicidal maniac, is permitted to escape. B attacks and causes harm to C. A is subject to liability to C.

**14.** RESTATEMENT (SECOND) OF TORTS § 315 (1965); W. PROSSER, W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER & KEETON ON THE LAW OF TORTS § 33, at 202–03 (5th ed. 1984) [hereinafter cited as PROSSER & KEETON]; *Hicks v. United States,* 511 F.2d 407, 415 (D.C.Cir.1975); *see also Bradley Center, Inc. v. Wessner,* 161 Ga.App. 576, 580, 287 S.E.2d 716, 720–21, *aff'd,* 250 Ga. 199, 296 S.E.2d 693 (1982); *Maroon v. State,* 411 N.E.2d 404, 414 (Ind.App.1980); *Cansler v. State,* 234 Kan. 554, 564–65, 675 P.2d 57, 62–63 (1984); *Cain v. Rijken,* 74 Or.App. 76, 79–80, 700 P.2d

1061, 1064 (1985), *review granted,* 300 Or. 111, 707 P.2d 583 (1985); *Allentown State Hospital v. Gill,* 88 Pa.Commw. 331, 488 A.2d 1211 (1985); *Petersen v. State,* 100 Wash.2d 421, 671 P.2d 230 (1983).

**15.** *Hicks v. United States,* 511 F.2d 407, 415 (D.C.Cir.1975).

**16.** *Id.* at 422 (Tamm, J. and McGowan, J., concurring).

**17.** *See Maroon v. State,* 411 N.E.2d 404 (Ind. App.1980) (escape from mental hospital); *Rum River Lumber Co. v. State,* 282 N.W.2d 882 (Minn.1979) (same); *Comiskey v. State,* 71 A.D.2d 699, 418 N.Y.S.2d 233 (1979) (same).

**18.** D.C.Code § 24–301(e) (1981).

**19.** *Id.*

Ultimately, therefore, the decision as to the dangerousness of those patients committed to St. Elizabeths after acquittal by reason of insanity is not one for the Hospital; rather, St. Elizabeths is obligated to treat these patients as dangerous until a court determines otherwise.[20] The purpose of section 24–301 "is to protect the patient and the public by insuring that statutory standards for release are not subverted by allowing the ultimate determination [of dangerousness] to be made according to the individual, subjective standards of the hospital staff." [21] Hence, regardless of its own view of Dwayne White's dangerousness, St. Elizabeths had an obligation to confine Dwayne White to the Hospital grounds. In a case involving circumstances very similar to those here, the Fourth Circuit held:

> The Restatement [of Torts] measures a custodian's duty by the standard of reasonable care. Here, that standard has been delineated by the precise language of the court order. The appellants were to retain custody over [the patient] until

he was released from the Institute by order of the court. No lesser measure of care would suffice.... [T]hey could not substitute their judgment for the court's with respect to the propriety of releasing him from confinement.[22]

Given this presumption of dangerousness, we must focus solely on whether the Hospital breached its duty to confine White to the Hospital grounds. The evidence supporting the Hospital's argument that White was not dangerous is simply not relevant to the ultimate determination of negligence in this case.

■ As to the question of whether the Hospital breached its duty, we conclude that officials at St. Elizabeths were negligent in permitting White to escape. It is uncontested that the Hospital was aware of at least two instances during 1979 in which Dwayne White left the grounds—once in March 1979, to marry Genoa White and once in September 1979, to assist appellant when she required hospitalization in connection with a possible miscarriage. Yet, Dwayne White's voluminous Hospital

20. As the D.C. Court of Appeals explained:
The District of Columbia, like many states, provides for judicial approval prior to the release of an acquittee. In so doing, this jurisdiction has concluded legislatively that the judiciary is best suited to performing "the value-weighing function of balancing the unpredictable risks to individual liberty and public safety" posed by the release decision. *DeVeau v. United States,* 483 A.2d 307, 311 (D.C. 1984) (upholding trial court's refusal to allow release of St. Elizabeths patient) (quoting Goldstein & Katz, *Dangerousness and Mental Illness: Some Observations on the Decision to Release Persons Acquitted by Reason of Insanity,* 70 Yale L.J. 225, 237 (1960)).

21. *United States v. McNeil,* 434 F.2d 502, 515 (D.C.Cir.1970) (Bazelon, C.J., concurring); *see also United States v. Ecker,* 543 F.2d 178, 186 (D.C.Cir.1976) (purpose of § 24–301 "is to assure that members of appellant's exceptionally dangerous class are 'kept under hospital restraint until the District Court, in the exercise of a discretion, reviewable in this Court, approves a relaxation of that restraint' ") (quoting *Hough v. United States,* 271 F.2d 458, 462 (D.C.Cir. 1959)), *cert. denied,* 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977).

22. *Semler v. Psychiatric Institute of Washington, D.C.,* 538 F.2d 121, 125 (4th Cir.), *cert. denied,* 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 90 (1976);

*see also Maroon v. State,* 411 N.E.2d 404, 416 (Ind.App.1980) ("The Department could not exercise discretion and determine whether or not to maintain custody of Lett, but had to maintain such custody in obedience to the mandate of the Knox Circuit Court without regard to, or the exercise of, its own judgment as to the propriety of so doing."); *Robilotto v. State,* 104 Misc.2d 713, 429 N.Y.S.2d 362 (Ct.Claims 1980) (standard of care measured by release statute, which required officials to give juvenile offender "suitable supervision").

Because (1) D.C.Code § 24–301 is designed to promote public safety, (2) Genoa White is a member of the class intended to be protected by the provision, and (3) the D.C.Code imposes a specific duty on St. Elizabeths, § 24–301 creates a standard of reasonable care that must be met by the Hospital. *See District of Columbia v. White,* 442 A.2d 159, 164 (D.C.1982) (violation of a statute, which made excessive force by an officer criminal, constitutes evidence of negligence in a civil action); *Leiken v. Wilson,* 445 A.2d 993, 1002 (D.C.1981) (finding "presumption of negligence" for violation of a traffic regulation). The Hospital was therefore obligated to treat White as presenting "a danger to others," D.C.Code § 24–301(e), until White was judged ready to re-enter society by the District Court.

Records fail to reflect a single measure subsequently taken by Hospital staff to ensure that Dwayne White would remain on Hospital grounds or even a modicum of concern about these known absences. Although by June of 1979 the Hospital knew that Dwayne White had left the grounds to marry appellant, there is not even a reference to the marriage in his medical records until a September 25, 1979 note on White's progress. The Hospital was aware that Dwayne White had left the grounds on September 19, 1979—only ten days after his grounds privileges were increased to 9-to-9 privileges—but his medical records again evidence no measures taken to ensure that he would remain on Hospital grounds.[23] In addition to these two known unauthorized absences, members of the Hospital staff admitted that White was probably visiting his wife on a routine basis. In our view, the ease with which White was able to leave Hospital grounds and the failure of the Hospital to respond in any way to the known instances of White's unauthorized absences are more than sufficient to constitute a breach of the Hospital's duty to take reasonable steps to keep Dwayne White confined to the Hospital grounds. On the record before us, the District Court's conclusion to the contrary was clearly erroneous.

This negligence, moreover, is compounded by the fact that the Hospital had every reason to know that Dwayne White was *in fact* leaving the Hospital grounds on a routine basis. By September 25, 1979, the Hospital staff was well aware of Dwayne White's desire to leave Hospital grounds to help his wife. In a progress report, the Hospital noted:

> It seems that the most anxiety provoking element for Mr. White at this time is his wife. That is, he is not able to be with her off of the grounds, she is now pregnant with some possible medical complications and she is not, by history, a very mentally stable individual. Because of these things *Mr. White feels a great deal of pressure to help his wife and to be with her*, but is unable to do these things because of his hospital confinement.[24]

It is somewhat remarkable that even after this acknowledgment of White's desire to leave the grounds to be with wife— *made only six days after the Hospital learned of Dwayne White's second known unauthorized absence with his wife*—the Hospital took no steps to increase their supervision of White's grounds privileges. Furthermore, at least one Hospital staff member who had contact with Dwayne White during this period admits to having had suspicions that Dwayne White was leaving the Hospital with regularity to visit his wife. Although Dr. Madsen testified that he did not *know for sure* that White was leaving the grounds,[25] he had "suspected" that White was doing so because it had been his experience "that individuals who go off the hospital grounds once will go off the grounds at other times."[26] Indeed, Dr. Madsen testified that *before* the assault on Genoa White, he "personally believed that [White] had probably" been going off the Hospital grounds with some regularity.[27]

---

23. Indeed, Dr. Polley of St. Elizabeths testified that except for the early part of 1979 there was not even a requirement that Dwayne White have any "telephone check-ins." Tr. at 254–55. He also testified that Dwayne White was probably visiting his wife "three times a week or so." Tr. at 246.

24. Exhibit 2 to Record Document No. 17 at 1379–80 (emphasis supplied).

25. The Hospital continually emphasizes that its staff members did not *know for sure* that White was leaving the grounds. This ignores the point—as Dr. Madsen's testimony suggests—that Hospital staff had every *reason to know* about these absences. It is also noteworthy that Dr. Madsen warned Dwayne White that White should "not ... tell me anything that he chose not to tell or divulge, because there was no such thing as confidentiality in my relationship with him." Tr. at 173. We are not surprised, therefore, that Dwayne White chose not to give explicit notice to Dr. Madsen about his unauthorized absences.

26. Tr. at 172.

27. Tr. at 173.

In short, we find that the Hospital was clearly negligent in failing to police and confine White to Hospital grounds. Until a court determined that White no longer presented a danger to the public, the Hospital was obligated to take steps reasonably necessary to keep him on its grounds. The record in this case is simply devoid of evidence that the Hospital even attempted to meet this obligation.[28]

## 2. Proximate Causation

Having determined that the Hospital breached its duty to confine Dwayne White to the Hospital grounds, our next inquiry is whether Genoa White's injuries were proximately caused by the Hospital's negligence. The District Court concluded that the appellant's injuries were not proximately caused by the Hospital's negligence because the injury was not foreseeable. We hold that, in reaching this conclusion, the District Court applied the wrong test of proximate cause; we also hold that the judgment of the District Court as to foreseeability was clearly erroneous.

Although the District Court analyzed proximate causation in terms of foreseeability, the established case law in the District of Columbia is not so limited. The D.C. Court of Appeals has held that the proximate causation requirement can be satisfied in certain circumstances even if the harm was *un*foreseeable:

> under proximate cause analysis, an actor whose "conduct is a substantial factor in bringing about harm," ... shall be liable in negligence (1) for harm foreseeably attributable to his or her conduct, and (2) for *unforeseeable* harm attributable to his or her conduct unless, "after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have" done so.[29]

■ Under either the "foreseeability" analysis used by the District Court or the "highly extraordinary in retrospect" alternative appropriate under District of Columbia law, the injury to Genoa White was proximately caused by the Hospital's negligence. Dwayne White had a long history of violent assaults and was committed to St. Elizabeths to protect the public from the very type of behavior that led to Genoa White's injuries in this case. Had this behavior not been foreseeable, Dwayne White would not have been continuously confined to St. Elizabeths. In short, the assault on Genoa White was so closely related to the very reason Dwayne White had been committed to the Hospital grounds that we have no difficulty holding that the assault was proximately caused by the Hospital's breach of its obligation to confine White.[30]

28. We emphasize that we are *not* holding that the decision to grant grounds privileges to Dwayne White was negligent. Instead, we find that *in this case* the Hospital was negligent in its supervision of White once he was granted privileges. Hence, whether the Hospital was negligent in the decision to grant White grounds privileges is an issue we need not reach.

Although the District Court focused on the decision to grant grounds privileges, appellant's complaint does allege that St. Elizabeths "negligently failed to take reasonable precautions and negligently failed to provide reasonable supervision to insure that said White was unable to leave the hospital grounds unaccompanied." Complaint, Record Document No. 1, at ¶ 6. This allegation was reiterated by appellant in her Argument in Support of Plaintiff's Motion for Summary Judgment, Record Document No. 14, at 12.

29. *Morgan v. District of Columbia*, 449 A.2d 1102, 1111 (D.C.1982) (quoting RESTATEMENT (SECOND) OF TORTS § 435) (emphasis supplied), *vacat-*

ed on other grounds, 468 A.2d 1306 (D.C.1983) (en banc). Following rehearing en banc, the entire D.C. Court of Appeals adhered to the panel's test of proximate causation. *See Morgan v. District of Columbia*, 468 A.2d 1306, 1318 (D.C.1983) ("A defendant may not be held liable for harm actually caused where the chain of events leading to the injury appears 'highly extraordinary in retrospect.'"); *see also Lacy v. District of Columbia*, 424 A.2d 317, 320–21 (D.C. 1980) (same). This "highly extraordinary in retrospect" analysis has been adopted in other cases similar to the instant case. *See, e.g., Vattimo v. Lower Bucks Hospital, Inc.*, 502 Pa. 241, 253–54, 465 A.2d 1231, 1237 (1983).

30. *See Hicks v. United States*, 511 F.2d 407, 421–22 (D.C.Cir.1975) (attack on wife by St. Elizabeths patient was foreseeable because it "was closely related to the very reason he had been committed originally to the Hospital"). As Prosser and Keeton observe, proximate causation analysis rests on a simple question: "was the

■ A related, and somewhat more difficult issue, is whether Dwayne White's criminal act was a superseding legal cause exonerating St. Elizabeths from liability.[31] Under District of Columbia law, St. Elizabeths is responsible for the injuries caused by intervening criminal acts only if the acts "should have reasonably been anticipated and protected against."[32] However, "[w]here criminal acts operate on a background created by defendant, the real issue is whether the defendant should be *responsible* for the intervening criminal acts."[33] Thus, if the likelihood of a patient's criminal conduct is a hazard that the Hospital is obligated to protect against, that criminal conduct does not become a superseding cause that exonerates the Hospital.[34]

Applying these principles, we conclude that Dwayne White's criminal conduct should have been anticipated and hence was not a superseding cause. Indeed, given our conclusion that assaultive behavior was foreseeable, it inevitably follows that this criminal behavior—an assault—was foreseeable. As with assaultive behavior, the criminal conduct in this case is a hazard from which St. Elizabeths was obligated to protect the public. It was similar criminal behavior that led to Dwayne White's original commitment to the Hospital, and it was the real threat of future criminal behavior that kept him there.

Likewise, the appellant's own behavior was not a superseding cause eliminating the Hospital's liability. If Genoa White assumed the risk of this type of attack or if the extent of her own unreasonable behavior provoked the attack, this would not affect our judgment on proximate cause. Rather, these questions are best analyzed as defenses to a negligence action.[35] In other words, even if Dwayne White was "provoked" by appellant's behavior, it was because of his proclivity to violence when confronted with such provocation that he was continually committed to St. Elizabeths. Therefore, such "provocation" would in no way alter the analysis of proximate cause.

In sum, the Hospital in this case had a clear obligation to protect the public from the danger that Dwayne White would become violently assaultive. Given the close match between the reasons the Hospital was required to keep Dwayne White confined and the unfortunate consequences of its negligence, we conclude that Genoa White's injuries were proximately caused by the Hospital's negligence.

## C. *Affirmative Defenses*

The Hospital raised in its answer the defenses of contributory negligence and assumption of risk. Because the District Court held that appellant had not established that the Hospital was negligent, it did not rule that either of these defenses would bar recovery in this case.[36] We

---

defendant under a duty to protect the plaintiff against the event which did in fact occur?" Prosser & Keeton, *supra,* note 14, § 42, at 274. D.C.Code § 24–301 was enacted to protect the public from the very type of harm caused in the instant case. We therefore fail to understand the Hospital's insistence that proximate causation was lacking in this case.

**31.** *See Morgan,* 449 A.2d at 1111.

**32.** *Id.* (quoting *St. Paul Fire and Marine Ins. Co. v. James G. Davis Construction Corp.,* 350 A.2d 751, 752 (D.C.1976)); *Ceco Corp. v. Coleman,* 441 A.2d 940, 944 (D.C.1982); *Lacy v. District of Columbia,* 424 A.2d 317, 323 (D.C.1980); *Rieser,* 563 F.2d at 479.

**33.** *Graham v. M & J Corp.,* 424 A.2d 103, 107 (D.C.1980) (emphasis in original); *see also* PROSSER & KEETON, *supra* note 14, § 44, at 305 (de-

fendant is responsible despite intervening criminal act if the acts are those "the defendant might reasonably anticipate, and against which the defendant would be required to take precautions.").

**34.** *See Christensen v. Epley,* 36 Or.App. 535, 542, 585 P.2d 416, 421 (1978), *rev'd on other ground,* 287 Or. 539, 601 P.2d 1216 (1979).

**35.** *See* PROSSER & KEETON, *supra* note 14, § 42, at 275–76; *id.* § 65, at 452.

**36.** In the District of Columbia, both defenses would completely bar recovery. *See Elam v. Ethical Prescription Pharmacy, Inc.,* 422 A.2d 1288, 1289 n. 2 (D.C.1980) (contributory negligence is complete bar to recovery); *Morrison v. MacNamara,* 407 A.2d 555, 566 (D.C.1979) (assumption of risk is complete bar to recovery).

therefore must remand the case to the District Court for consideration of these defenses. The applicability of these defenses in this case, however, is at best uncertain.

We doubt, for example, whether the record in this case supports the necessary finding that Genoa White had knowledge of the danger to which she was exposed by contact with her husband. Under District of Columbia law, the Hospital must establish that she had knowledge of the danger in order to prevail on its defense of assumption of risk.[37] The evidence "must show that the plaintiff possessed full comprehension and appreciation of the danger" and "a plaintiff who through inexperience or immaturity fails to fully comprehend a risk, may not be held to the same level of understanding as a plaintiff who has superior intelligence or experience."[38] The Hospital's own records conclude that Genoa White was not mentally stable,[39] and it is uncontested that Genoa White knew Dwayne White only during his least violent period. Although the Hospital was obligated to treat Dwayne White as a dangerous patient by the D.C.Code, no such presumption applies to appellant. To prevail on its assumption of risk defense, the Hospital must prove that Genoa White had "full comprehension and appreciation" of the risk she was assuming. Given her own mental instability and Dwayne White's relatively peaceful nature during the time of his visits to her apartment, it will be difficult for the Hospital to successfully establish that appellant assumed any risk.

Furthermore, given Genoa White's obviously limited understanding of the danger presented by her husband, it is not clear that her conduct was sufficiently unreasonable to constitute contributory negligence.

In order to be contributorily negligent, the Hospital must demonstrate that appellant was "aware of or should have appreciated the risks involved."[40] We are uncertain whether the appellant's behavior was sufficient to nullify the Hospital's responsibility to keep White confined. Although Dwayne White viewed the photographs as "provocative," we have doubts that any person in Genoa White's position would have foreseen her husband's violent reaction to their display. Additionally, the District Court may decide that the District of Columbia should follow "the great majority of courts" and apply a lower standard of care to those, such as appellant, who may be mentally incapacitated.[41]

## III. Conclusion

The Hospital owed a duty to members of the public—including Genoa White—to keep Dwayne White confined to Hospital grounds until the District Court determined that his release was appropriate. Under the circumstances of this case, we conclude that the Hospital was clearly negligent in its fulfillment of this obligation and that the injuries to Genoa White were proximately caused by this negligence. The District Court's findings to the contrary are clearly erroneous. We therefore reverse and remand to the District Court for consideration of the affirmative defenses of contributory negligence and assumption of risk.

*So ordered.*

37. *See Morrison,* 407 A.2d at 566.

38. *Id.* at 566–67; *see also* Restatement (Second) of Torts § 496E comment (a) (1965); Prosser & Keeton, *supra* note 14, § 68, at 486–87.

39. Exhibit 2 to Record Document No. 17 at 1379–80.

40. *Santoni v. Moodie,* 53 Md.App. 129, 137, 452 A.2d 1223, 1227 (1982).

41. Prosser & Keeton, *supra* note 14, § 32, at 178; *see also* Restatement (Second) of Torts § 464(1) (1965); *Young v. State,* 92 Misc.2d 795, 796, 401 N.Y.S.2d 955, 956 (Ct.Claims 1978) ("Even some lesser degree of mental impairment than retardation or psychosis may preclude a finding of contributory negligence, if the plaintiff's faculties are not sufficient to perceive and avoid a particular risk of harm.").