[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTIONS TO STRIKE BY PETER SMITH, M.D., PRO BEHAVIORAL HEALTH, INC. AND PHYSICIANS HEALTH SERVICES OF CONNECTICUT, INC.
By motion dated November 17, 2000, defendant Peter Smith, M.D. ("Smith") has moved to strike the First and Seventh Counts of the Revised Complaint dated October 14, 2000 (the "Complaint"). By motion dated November 14, 2000, defendants Pro Behavioral Health, Inc. and Pro Behavioral Health of Connecticut, LLC (collectively, the "PRO entities") have moved to strike the Fourth, Fifth, Sixth and Seventh Counts of the Complaint and by motion dated November 13, 2000, defendants Physicians Health Services of Connecticut, Inc. ("PHS") and M.D. Health Plan, Inc. ("MDHP") have moved to strike the Fifth Count of the Complaint.
Statement of Facts
On March 6, 1998, Matthew Beck ("Mr. Beck") killed Otho Brown, Frederick Rubelmaun, Linda Mlynarczyk, and Michael Logan. (Complaint, First Count ¶ 9) After Mr. Beck murdered these four individuals, he killed himself (Complaint, First Count, ¶ 9) at the Connecticut Lottery ("the Lottery") Headquarters. (Complaint, First Count, ¶ 1) Mr. Beck and his victims were employees of the Lottery. (Complaint, First Count, ¶¶ 1, 11(d))
For some time prior to March 6, 1998, Dr. Smith was Mr. Beck's treating psychiatrist. (Complaint, First Count, ¶¶ 6-7) Dr. Smith was also CT Page 10702 allegedly PRO's medical director, and as such, was allegedly in charge of PRO. PRO was allegedly "the managed care company providing Matthew Beck's psychiatric treatment." (Complaint, First Count, ¶ 6)
The defendant Smith treated Matthew Beck in 1997 and 1998 prior to March 6, 1998. In this period of time, Matthew Beck was seen and treated by the defendant on several occasions, including the following occasions when:
 (a) On October 15, 1997, Matthew Beck stated that he was experiencing harmful and dangerous thoughts, and related that he had had temper tantrums, sleep problems, and obsessive thoughts. He also related that he had been admitted to a hospital twice in 1997 for suicide attempts.
 (b) Also on October 15, 1997, Matthew Beck stated that he perceived a lack of support at work, had filed a grievance, and was diagnosed with an intermittent explosive disorder and paranoid traits.
 (c) On October 29, 1997, Beck explained that he became angry and enraged at work, and had suicide ideation. Beck had a profound primitive sense of right and wrong. He felt that his employer was trying to make his life miserable. At this point, defendant Smith advised Beck to stay out of work. He showed an increase in paranoia, anger, and again, "some threatening."
 (d) On November 18, 1997, Beck continued to express a great deal of anger at his employer and related a great deal of work stress. He stated to the defendant Smith that he had written to the Attorney General, called the State Police, the Governor's office and the FBI concerning his problems at his place of employment. He was preoccupied and showed paranoia.
 (e) On December 2, 1997, Beck continued to express anxiety concerning his employment which he stated had led to verbally explosive outbursts. He stated he did not feel respected or treated fairly and was unable to tolerate a discussion of current events regarding his employment.
(f) On December 16, 1997, Beck again expressed anger CT Page 10703 about his work.
 (g) On December 30, 1997, Beck continued to be obsessed with his work problems and depressed about the consequences, was not sleeping or eating well because of them. He entertained vengeful thoughts towards his employers and showed increased agitation and paranoia about his work.
 (h) On December 30, 1997, Beck had an increase in anxiety regarding a hearing he was to have concerning his employment. At this time, defendant Smith recommended that Beck stay out of work until June 1, 1998.
 (i) On January 10, 1998, Beck stated that he felt lied to and unsupported by his superiors at work. He became very agitated and had significant suicidal ideation.
 (j) On January 27, 1998, Beck related that he was to have a hearing on February 5, 1998, had considerable insomnia and anxiety, and stated that he had dreams of violent outbursts, fears of violent outbursts, mostly directed against himself but also directed to others, especially when he returns to work. Notwithstanding these statements and findings, defendant Smith changed his recommendation and suggested that Beck return to work on March 1, 1998.
 (k) On February 10, 1998, Beck continued to be preoccupied with his work situation.
 (l) On February 24, 1998, Beck stated that he planned to return to work on February 25, and was apprehensive.
 (m) On March 3, 1998, Beck stated that he had returned to work on February 25, 1998.
Discussion of the Law and Ruling
The function of a motion to strike is to test the legal sufficiency of a pleading. Practice Book § 10-39; Ferryman v. Groton, 212 Conn. 138,142, 561 A.2d 432 (1989); Mingachos v. CBS, Inc., 196 Conn. 91, 108,491 A.2d 368 (1985). In deciding a motion to strike the trial court must consider as true the factual allegations, but not the legal conclusions CT Page 10704 set forth in the complaint. Liljedahl Bros., Inc. v. Grigsby,215 Conn. 345, 348, 576 A.2d 149 (1990); Blancato v. Feldspar Corp.,203 Conn. 34, 36, 522 A.2d 1235 (1987).
The court should view the facts in a broad fashion, not strictly limited to the allegations, but also including the facts necessarily implied by and fairly provable under them. Dennison v. Klotz,12 Conn. App. 570, 577, 532 A.2d 1311 (1987). In ruling on a motion to strike, the court must take as admitted all well-pled facts, and those necessarily implied thereby, and construe them in the manner most favorable to the pleader. Norwich v. Silverberg, 200 Conn. 367, 370,511 A.2d 336 (1986).
Duty of Psychiatrist to Third Parties
In the First Count of the Complaint the plaintiffs allege that Dr. Smith failed to properly treat and control Mr. Beck and failed to warn the plaintiffs' decedent or the other employees of the Lottery Commission that Mr. Beck was likely to present a substantial risk to their safety. The following Connecticut and federal cases address the duty owed by a psychiatrist to third parties. Fraser v. United States, 236 Conn. 625,632, 674 A.2d 811 (1996); Kaminski v. Fairfield, 216 Conn. 29,578 A.2d 1048 (1990); Zamstein v. Marvasti, 240 Conn. 549, 692 A.2d 781
(1997); Jacoby v. Brinckerhoff, 250 Conn. 86, 735 A.2d 347 (1999);Jablonski v. United States, 712 F.2d 391 (9th Cir. 1983); Garamella v.New York Medical College, 23 F. Sup.2d 167 (D.Conn. 1998); Almonte v.New York Medical College, 851 F. Sup. 34 (D.Conn. 1994).
In Fraser, a psychiatric outpatient who had no history of violence stabbed his friend and former employer 40 times, causing his death. The Connecticut Supreme Court held that the patient's psychotherapist had no duty to control the patient because the decedent was not an identifiable potential victim, or within the class of identifiable potential victims of the patient. The Court stated:
 Considerations of public policy, which undergird the judicial determination of the scope of duty in the law of negligence, likewise suggest that psychotherapists should not be held liable to third parties who are not foreseeable victims. In addressing the third party liability of attorneys for the negligent execution of estate planning documents, we have balanced the interests of intended beneficiaries against the interests of the legal profession in honoring the ethical obligations owed by attorneys to their clients. See Krawczyk v. Stingle, 208 Conn. 239, CT Page 10705 244-46, 543 A.2d 733 (1988) (no liability to intended beneficiary for negligent delay in drafting estate planning documents). We deem it equally appropriate to balance the interests of those injured by psychiatric outpatients against the interests of the mental health profession in honoring the confidentiality of the patient-therapist relationship; see General Statutes §§ 52-146d through 52-146j; and in respecting the humanitarian and due process concerns that limit the involuntary hospitalization of the mentally ill. See State v. Warren, 169 Conn. 207, 215-16, 363 A.2d 91
(1975); see also General Statutes §§ 17a-498 and 17a-502; Payne v. Fairfield Hills Hospital, 215 Conn. 675, 684, 578 A.2d 1025 (1990). Whatever that balancing process may indicate in other circumstances, it counsels against the imposition of liability for harm to unidentifiable victims or unidentifiable classes of victims of outpatients with no history of dangerous conduct or articulated threats of dangerous behavior. See note, "Duty to Warn Versus Duty to Maintain Confidentiality: Conflicting Demands on Mental Health Professionals," 20 Suffolk U.L.Rev. 579, 612-13 (1986); V. Mangalmurti, "Psychotherapists' fear of Tarasoff: all in the mind?," 22 J. Psychiatry L. 379 (1994); C. Meyers, "Where the protective privilege ends: California changes the rules for dangerous psychotherapy patients," 19 J. Psychiatry L. 5, 26-27
(1991); R. Schopp, "The Psychotherapist's Duty to Protect the Public: The Appropriate Standard and the Foundation in Legal Theory and Empirical Premises," 70 Neb.L.Rev. 327, 350-60 (1991).
236 Conn. at 634-635 (emphasis added.)
The defendants, Dr. Smith and the Pro Entities, argue that Dr. Smith has no liability to the plaintiffs as a matter of law because the plaintiffs have alleged neither that Mr. Beck threatened an identified or identifiable person with imminent physical harm nor that Mr. Beck had a history of dangerous conduct. It is true that there is no allegation that Beck had a history of dangerous conduct. However, Fraser speaks of "outpatients with no history of dangerous conduct or articulated threats of dangerous behavior." 236 Conn. at 635 (emphasis added). Therefore under Fraser a claim is stated based on the allegation of either threats of harm or a history of dangerous conduct.
The court does not agree that the plaintiffs have failed to allege CT Page 10706 threatening conduct sufficient to impost a duty under Fraser. The plaintiffs have alleged that: "Matthew Beck stated that he perceived a lack of support at work, had filed a grievance, and was diagnosed with an intermittent explosive disorder and paranoid traits;" "He felt that his employer was trying to make his life miserable;" "He showed an increase in paranoia, anger, and again, `some threatening;'" "On November 18, 1997, Beck continued to express a great deal of anger at his employer and related a great deal of work stress. He stated to the defendant Smith that he had written to the Attorney General, called the State Police, the Governor's office and the FBI concerning his problems at his place of employment. He was preoccupied and showed paranoia;" "On December 2, 1997, Beck continued to express anxiety concerning his employment which he stated had led to verbally explosive outbursts. He stated he did not feel respected or treated fairly and was unable to tolerate a discussion of current events regarding his employment;" "On December 16, 1997, Beck again expressed anger about his work;" "On December 23, 1997, Beck continued to be obsessed with his work problems and depressed about the consequences, was not sleeping or eating well because of them. He entertained vengeful thoughts towards his employers and showed increased agitation and paranoia about his work;" and "On January 27, 1998, Beck related that he was to have a hearing on February 5, 1998, had considerable insomnia and anxiety, and stated that he had dreams of violent outbursts, fears of violent outbursts, mostly directed against himself but also directed to others, especially when he returns to work." See Complaint, Count One, ¶ 8. Taken in a manner most favorable to the plaintiffs, as required when considering a motion to strike, the foregoing allegations could be interpreted as threats against a specifically identifiable group, Beck's fellow employees. The plaintiffs' decedent was a member of that group.
Fraser and Kaminski, supra, both recognized the existence of a duty of a psychiatrist or psychotherapist to third party victims of their patients in limited circumstances. However the facts in those cases were held not to give rise to any duty. In Fraser, the patient never expressed thoughts of violence towards anyone, and never mentioned his victim in any context. Thus, the case gives no guidance as to what type of behavior or statements made by a patient to a psychiatrist or psychotherapist could constitute a "threat." However the Courts in Jablonski v. UnitedStates, 712 F.2d 391 (9th Cir. 1983); Garamella v. New York MedicalCollege, 23 F. Sup.2d 167 (D.Conn. 1998); Almonte v. New York MedicalCollege, 851 F. Sup. 34 (D.Conn. 1994) did find a duty to third party victims. Those cases also support the plaintiffs' contention that the First Count of the Complaint states a cause of action against Dr. Smith.
In Almonte, Judge Nevas denied a Rule 12(b)(6) motion to dismiss filed by a psychiatrist who had failed to warn of the pedophilic tendencies of CT Page 10707 his patient, resulting in the sexual abuse of a child. The court found that the plaintiffs had alleged adequate grounds upon which to find a duty to warn:
 As the California court in Tarasoff [v. Regents of the University of California] explained, "when a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger," and the discharge of this duty may include the duty to "warn the intended victim or others likely to apprise the victim of the danger. . . ." Tarasoff, 551 P.2d at 340. Accord, White v. United States, 780 F.2d 97, 101
(D.C. Cir. 1986) (recognizing duty to warn and noting that the Tarasoff rule is followed in a number of jurisdictions); Jablonski v. United States, 712 F.2d 391, 398 (9th Cir. 1983) (following Tarasoff even though no specific threats made to victim).
 Significantly, the Connecticut Supreme Court in Kaminski did not reject Tarasoff, but merely distinguished the case on its facts. Indeed, in distinguishing Tarasoff, the Connecticut Supreme Court appears to have accepted the rule that a psychiatrist who knows or should know that a patient poses a threat to a particular victim or class of victims has a duty to warn such victims of the danger.
851 F. Supp. at 41 (internal punctuation and emphasis omitted).
In a subsequent proceeding in the same case, Judge Fitzsimmons denied the psychiatrist's motion for summary judgment, concluding "a psychiatrist has a duty to speak where harm to identifiable victims is a foreseeable consequence of his silence." Garamella,23 F. Supp.2d at 175.
In Garamella, the patient had admitted to pedophilic tendencies and was known to be pursuing a career in child psychiatry. It was not known if he had ever acted on his tendencies or if he intended to do so. Id. at 174. The court found that these facts, without more, were sufficient to state a "specific threat" against an identifiable class of victims containing the plaintiff. Id. "While defendant argues there `was no one to warn and there was nothing to warn about,' the Court cannot so find as a matter of law on this record. These are determinations which must be made by a CT Page 10708 jury." Id. at 175.
Other jurisdictions have also concluded that a fact question is presented by the foreseeability that a psychiatrist's patient will harm a victim. See, e.g., Davis v. Lhim, 335 N.W.2d 481 (Mich.App. 1983); reversed on other grounds sub nom Canon v. Thumudo, 422 N.W.2d 688
(Mich. 1988).
In Jablonski, supra, a husband killed his wife and the wife's estate sued the husband's psychiatrist for failing to sufficiently control the husband. The psychiatrist argued, as the defendants here argue, that there could be no liability because the husband/patient had made no specific threats concerning his wife or any other specific individuals. Nevertheless, his medical history indicated that he would likely direct his violence against his wife. He had raped and committed other acts of violence against a previous wife and his psychological profile indicated that his violence was likely to be directed against women very close to him. Therefore, the Court held that the wife was within a class of specifically identifiable victims to whom the psychiatrist owed a duty even though the patient had made no specific threats against anyone.
The defendants suggest that the public policy concerns identified by the Supreme Court in Zamstein and Jacoby are present in this case and, as in those cases, should preclude the liability of Dr. Smith as a matter of law. The court does not agree.
In Zamstein the principal issue was whether a psychiatrist hired to evaluate two children to determine whether they had been sexually abused owed a duty of care to the father of the children who was the suspected abuser, arising out of the psychiatrist's evaluation of the children for abuse. The Court stated that "[t]he legislature has expressed the strong public policy of encouraging medical professionals and other persons to report actual and suspected child abuse to the appropriate authorities and agencies." 240 Conn. at 559. The public policy was codified in Connecticut General Statutes § 17a-101, which requires medical professionals to notify the commissioner of children and families, or local or state police, whenever they have "reasonable cause to suspect or believe" that a child under the age of eighteen has been abused. That statute provides a fine for failing to report such abuse and also provides that persons who make such reports in good faith "shall be immune from any liability, civil or criminal," that may result from making the report. Based on the foregoing the Court in Zamstein concluded
 that imposing a duty on mental health professionals pursuant to the plaintiffs theory of liability in the present case would carry with it the impermissible CT Page 10709 risk of discouraging such professionals in the future from performing sexual abuse evaluations of children altogether, out of a fear of liability to the very persons whose conduct they may implicate. Such a result would necessarily run contrary to the state's policy of encouraging the reporting and investigation of suspected child abuse, as expressed in General Statutes (Rev, to 1995) § 17a-101, because effective evaluation and diagnosis of children is a necessary component of discovering the abuse in the first instance. In addition, imposing such a duty creates too high a risk that, in close cases, mental health professionals would conclude that no sexual abuse had occurred because they feared potential liability to the suspected abusers, rather than because of their professional judgment that, in all likelihood, no abuse had occurred.
240 Conn. at 560-561.
In Jacoby the plaintiff claimed that the defendant psychiatrist, in treating the mental illness of the plaintiffs former spouse, knew or should have known that the prescribed course of treatment would adversely impact the plaintiffs marriage and the plaintiff. The Court held that the psychiatrist had no duty to his patient's former spouse, stating "when it is foreseeable that marital differences may become a subject for therapeutic analysis, sound public policy counsels that a psychiatrist's treatment of a troubled spouse should not be burdened by accountability to the other spouse." 250 Conn. at 97.
The Court in Jacoby distinguished the circumstances of that case with those discussed in Fraser and stated:
 The plaintiff is not a victim as that term was used in Fraser. In defining the scope of duty of a psychotherapist, we deliberately focused on the centrality of the therapeutic relationship between a mental health professional and his or her patient. Id., 634-35. We declined to jeopardize that relationship except under the most compelling circumstances. Such an exception was warranted, we held, in the event of an imminent risk of serious personal injury to identifiable victims. Id., 634, 637.
250 Conn. at 96 (emphasis added). CT Page 10710
The plaintiffs' decedent in this case did not suffer an injury to his reputation or his feelings as did the plaintiffs in Zamstein and Jacoby, he lost his life. The Complaint alleges the imminent risk of serious personal injury to an identifiable class of victims, thus presenting circumstances which are sufficiently compelling from a public-policy viewpoint to warrant jeopardizing the patient-psychiatrist relationship.
For the foregoing reasons the Motion to Strike the First Count is denied.
Vicarious Liability
In the Fourth Count the plaintiffs allege that the defendant, Peter Smith, M.D. was the agent, servant, or employee of the defendants, the PRO Entities, and/or PHS/MDHP and was acting within the scope of his authority or employment. Based on this allegation, the plaintiffs have stated a cause of action against PRO and/or PHS/MDHP under the doctrine of respondeat superior. Under that doctrine an employer is liable for the negligent and wilful torts of his employee committed within the scope of the employee's employment and in furtherance of his master's business.Pelletier v. Bilbiles, 154 Conn. 544, 547, 227 A.2d 251 (1967); Rappaportv. Rosen Film Delivery System, Inc., 127 Conn. 524, 526, 18 A.2d 362
(1941); Antinozzi v. A. Vincent Pepe Co., 117 Conn. 11, 13, 166 A. 392
(1933); Son v. Hartford Ice Cream Co., 102 Conn. 696, 699, 129 A. 778
(1925).
Since the court has held that the First Count states a cause of action against Dr. Smith, the Fourth Count, which seeks to recover on the basis of respondent superior from his alleged employer, also states a cause of action. The Motion to Strike the Fourth Count is, therefore, denied.
Negligent Hiring
The defendant PRO argues that the Sixth Count should be stricken because PRO did not owe a direct duty to the plaintiffs' decedent.[1]
In the Sixth Count of the Complaint the plaintiffs claim that PRO should be held liable because it failed to use reasonable care in hiring Dr. Smith, ¶ 2(a); in supervising Dr. Smith ¶ 2(b); in placing Dr. Smith in or allowing him to serve in the allegedly conflicting roles of medical director and treating psychiatrist ¶¶ 2(c), 2(d); and in promulgating rules that promoted substandard psychiatric care ¶ 2 (e). The Complaint does not allege that PRO had a direct relationship with the plaintiffs or their decedent.
PRO owed no duty of care to the plaintiffs' decedent in the absence of a special relationship mandating such a duty. See Jacoby, 250 Conn. at 96
CT Page 10711 (noting that the plaintiff did not allege that the defendant ever undertook to treat the plaintiff either individually or as part of couples' counseling). In Fraser, the Court recognized that, "absent a special relationship of custody or control, there is no duty to protect a third person from the conduct of another." 236 Conn. at 632. As discussed above, the Court went on to delineate the narrow circumstances in which such a relationship would give rise to a duty to third parties. The plaintiffs do not allege that any such special relationship of custody or control existed between Dr. Smith and plaintiffs or plaintiffs' decedent.
Under Fraser and Jacoby, even where a special relationship exists between psychiatrist and patient, a duty to a third party only arises in the limited circumstances when (1) the outpatient has identified the third party to the psychiatrist as a target of violence and threatened him with imminent physical harm, or (2) when the outpatient identified the third party to the psychiatrist as a target of violence and the outpatient has a history of dangerous conduct towards others.
While Mr. Beck could have stated a cause of action against PRO based on its negligent hiring, supervision and training of Dr. Smith, the plaintiffs, who allege absolutely no relationship with PRO, cannot. The plaintiffs have not alleged that PRO knew that Mr. Beck had made threats of imminent physical harm to any identifiable person, or knew that he had a history of dangerous conduct towards others. Absent such allegations, the Fifth Count fails to state a cause of action in negligence against PRO in favor of the plaintiffs and is ordered stricken.
Apparent Authority
In the Fifth Count the plaintiffs allege that "the defendant Peter Smith, M.D. was held out to be the agent, servant, or employee of the defendants M.D. Health Plan, Inc., succeeded Physicians Health Services of Connecticut, Inc., Pro Behavioral Health, Inc., and/or Pro Behavioral Health of Connecticut, LLC on the basis that he was held out to be such, and was acting within the scope of his apparent or ostensible authority or employment." PHS and MDHP and the Pro Entities have moved to strike this Count on the grounds that it fails to state a claim on which relief can be granted because a fourth party, such as the plaintiffs' decedent, cannot recover under an apparent agency theory.
Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. Beckenstein v. Potter Carrier, Inc.,191 Conn. 120, 140, 464 A.2d 6 (1983) (quoting Restatement (Second), 1 Agency § 8). If the acts or omissions of a principal cause or allow a CT Page 10712 third person to believe that the principal has granted authority to an agent, that third person can hold the principal responsible for the acts of the apparent agent to the extent that they have relied in good faith on the apparent authority and have been injured by acts of the purported agent. Id.
To state a claim based on apparent authority, a plaintiff must plead that 1) the actions or omissions of a principal caused or permitted the plaintiff to believe that the principal had authorized an agent to act on the principal's behalf, 2) the plaintiff relied in good faith on the apparent authority in accepting the agent's actions and 3) the plaintiff had been injured by the actions of the agent Beckenstein,191 Conn. at 140.
If Mr. Beck had pled the foregoing elements he would have stated a cause of action under the apparent authority theory. But there is no law which recognizes the right of a fourth party, such as the plaintiffs' decedent, to recover under that theory. Obviously, that is because a fourth party such as the plaintiffs' decedent in this case did not have any contact whatsoever with the principal, PHS. Thus, the Fifth Count does not allege that any actions or omissions of PHS, or the Pro Entities caused Otho Brown to believe that they had authorized Dr. Smith to do anything, does not allege that Otho Brown relied in good faith on the apparent authority in accepting Dr. Smith's actions or that Mr. Brown was injured by the acts of Dr. Smith.
The principle that fourth parties cannot assert a claim for apparent agency is exemplified in Illustration 11 to Comment e to the Restatement (Second) of Agency, § 8 (1958):
 The Ace Taxi Company employs no drivers but merely receives orders from prospective passengers and puts "Ace Taxi Company" on cabs owned and operated by independent drivers. One of these drivers collides negligently with another automobile, damaging one of his passengers who reasonably believed the Taxi Company to be the employer. The Taxi Company is liable to the passenger but not to the owner of the other automobile.
The foregoing illustration reaffirms the obvious, that the plaintiffs' decedent, as a fourth party, cannot sue an alleged principal, PHS or the Pro Entities for actions by an alleged apparent agent, Dr. Smith, directed to a third party, Matthew Beck. Based on the foregoing the Motion to Strike the Fifth Count is hereby granted. CT Page 10713
Loss of Consortium
The Seventh Count is based on loss of consortium arising from the conduct of the defendants as alleged in the First, Fourth and Fifth and Sixth Counts. Therefore, the Motion to Strike the Seventh Count is denied, except insofar as it seeks consortium based on the Fifth, and Sixth Counts, which have been ordered stricken.
By the court,
Aurigemma, J.