BRUCE JACOBY v. PAUL BRINCKERHOFF ET AL.
(SC 16014)

Borden, Berdon, Norcott, Palmer and Peters, Js.

Argued June 1—officially released August 10, 1999

*Paul J. Pacifico,* for the appellant (plaintiff).

*Gaileen A. Kaufman,* with whom, on the brief, was *Garie J. Mulcahey,* for the appellee (defendant John Rhinehart).

*Opinion*

PETERS, J. In this medical malpractice case, the underlying issue is the extent to which a psychiatrist should be held liable for malpractice to a person who is not his patient but the former spouse of his patient. In particular, we must decide whether, in the absence of a claim against him by the patient, a psychiatrist owes any duty to the patient's former spouse, to compensate him or her either for loss of consortium or for the direct injury to the marriage. We conclude, as did the trial court, that the former spouse cannot prevail on the allegations contained in his complaint in this case, and that the court properly rendered a judgment in favor of the psychiatrist.

The plaintiff, Bruce Jacoby, filed an eight count complaint against the named defendant, Paul Brinckerhoff, a psychologist, and the defendant John Rhinehart, a psychiatrist.[1] Alleging that their treatment of his former spouse, Diane Jacoby, constituted a failure to render proper care, the plaintiff, in his third amended complaint, claimed a right to recover for: (1) loss of consortium; (2) breach of a contract of which the plaintiff was a third party beneficiary; (3) impairment of the marital relationship; and (4) breach of a direct contract to provide care to his spouse.[2]

The gravamen of the plaintiff's factual allegations was that both of the mental health professionals treating his former spouse knew or should have known that their recommended course of treatment and counseling would have an adverse effect on the plaintiff and his marriage. The plaintiff alleged that his former spouse suffered from bipolar disorder, which had been stabilized through the use of specified medication. Thereafter, he alleged, her mental condition deteriorated when Brinckerhoff and the defendant, having reached an alternative diagnosis, pursued a different course of treatment involving the use of different prescribed medication. That allegedly improper course of treatment led, according to the plaintiff, to the irretrievable breakdown of his marriage and the loss of maternal care for his children. His reputation allegedly was damaged as a result of a false report by his former spouse to the local police that he abused drugs and sexually abused his children. He also alleged that his former spouse is unwilling to pursue any claim for negligence or malpractice against the defendant.

---

[1] Although Brinckerhoff was named as a defendant, the plaintiff withdrew his claims against Brinckerhoff during the pendency of this appeal. We will, therefore, refer to Rhinehart as the sole defendant.

[2] The plaintiff alleged that he had paid medical bills rendered for the treatment of his former spouse.

The trial court granted the defendant's motion to strike all the counts of the plaintiff's original complaint that were directed against the defendant. The court made a similar ruling with respect to the plaintiff's third amended complaint.Thereafter, the court granted the plaintiff's motion for judgment in accordance with its ruling on the motion to strike. This appeal followed.[3]

On appeal, the plaintiff contests the validity of the trial court's judgment only with respect to his claims of negligence and malpractice insofar as they allegedly give rise to a claim for loss of consortium and for direct injury to his marriage.[4] We affirm the judgment of the trial court.

Our review of the judgment of the trial court is guided by well established principles. "In an appeal from a judgment granting a motion to strike, we . . . take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency." *Bohan* v. *Last*, 236 Conn. 670, 674, 674 A.2d 839 (1996); *Skuzinski* v. *Bouchard Fuels, Inc.*, 240 Conn. 694, 696, 694 A.2d 788 (1997); *Waters* v. *Autuori*, 236 Conn. 820, 825, 676 A.2d 357 (1996).

I

LOSS OF CONSORTIUM

The plaintiff's first claim on appeal is that, in count five of his complaint, he has alleged a viable cause of action for loss of consortium even though his former spouse has refused to join in the action. He claims in his brief that her refusal to initiate or to participate in

[3] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book § 65-1, and General Statutes § 51-199 (c).

[4] The plaintiff's appellate brief states that, for purposes of this appeal, "the plaintiff is not pursuing the issues raised in his counts concerning breach of contract and breach of a third party beneficiary duty."

the filing of an action for negligence or malpractice against the defendant is a result of her deteriorating mental condition.[5] Under these circumstances, the plaintiff argues that he is entitled to file suit for loss of consortium without joining it to a claim filed by her. He maintains that, because her conduct in declining to participate has made joinder impossible,[6] joinder should be excused.

The trial court rejected the plaintiff's claim on the ground that a cause of action for loss of consortium cannot be maintained in the absence of a primary cause of action asserted by the injured spouse. Although Connecticut law, at least by way of dictum, supports the trial court's conclusion, the plaintiff urges us to follow case law in other jurisdictions that, he claims, would permit an entirely freestanding pursuit of a claim for loss of consortium whenever an injured spouse declines to cooperate to protect the other spouse against a loss of consortium. We agree with the trial court.

This court first recognized a common-law claim for loss of spousal consortium in *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 487, 408 A.2d 260 (1979). Therein, we defined consortium "as encompassing the services of the [injured spouse], the financial support of the [injured spouse], and the variety of intangible relations which exist between spouses living together in marriage. Prosser, Torts (4th Ed. 1971) § 124, pp. 881–82. These intangible elements are generally described in terms of affection, society, companionship and sexual relations. Comment, 'The Action for Loss

---

[5] He does not claim, however, that his former wife lacks the mental capacity to join in his lawsuit, or to make her own competent decision regarding whether to do so.

[6] The record contains no allegations concerning the present whereabouts of the plaintiff's former spouse. We do not know, therefore, whether it would have been possible for the plaintiff to have filed a motion for mandatory joinder.

of Consortium in New Mexico,' 2 N. Mex. L. Rev. 107, 108 (1972). These intangibles have also been defined as the constellation of companionship, dependence, reliance, affection, sharing and aid which are legally recognizable, protected rights arising out of the civil contract of marriage. *Brown* v. *Kistleman*, 177 Ind. 692, 98 N.E. 631 (1912); Lippman, 'The Breakdown of Consortium,' 30 Colum. L. Rev. 651 (1930); Pound, 'Individual Interests in the Domestic Relations,' 14 Mich. L. Rev. 177 (1916); Holbrook, 'The Change in the Meaning of Consortium,' 22 Mich. L. Rev. 1 (1923)." (Internal quotation marks omitted.) Id. We recently reaffirmed the cause of action in precisely these terms. *Mendillo* v. *Board of Education*, 246 Conn. 456, 477, 717 A.2d 1177 (1998).

In *Hopson*, we considered the risk that enabling a spouse to recover for loss of consortium might lead to a multiplicity of legal claims arising out of a single act of negligence or intentional misconduct. We concluded that the risk would be minimized if "claims by spouses, whether for physical injuries or consortium losses, [were] joined in one action and tried before a single trier of fact." *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 494. Although we did not hold that joinder is always a prerequisite to an action for loss of consortium, we stated, in dictum, that "the consortium claim would be barred when the suit brought by the injured spouse has been terminated by settlement or by an adverse judgment on the merits." Id.

Our dictum in *Hopson* is a roadblock to the plaintiff's claim for recovery in this case. We can discern no viable distinction between precluding a consortium claim when the injured spouse has settled with the alleged tortfeasor and precluding it when the injured spouse, as in this case, has declined altogether to sue the alleged tortfeasor. Our statement reflects the premise, which the plaintiff does not challenge, that an action for loss

of consortium, although independent in form, is "derivative of the injured spouse's cause of action . . . ." *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 494; *Lynn* v. *Haybuster Mfg., Inc.*, 226 Conn. 282, 287, 627 A.2d 1288 (1993); *Izzo* v. *Colonial Penn Ins. Co.*, 203 Conn. 305, 312, 524 A.2d 641 (1987); *Ladd* v. *Douglas Trucking Co.*, 203 Conn. 187, 195, 523 A.2d 1301 (1987); *Champagne* v. *Raybestos-Manhattan, Inc.*, 212 Conn. 509, 563–64, 562 A.2d 1100 (1989).

Although the noninjured spouse has a right to choose whether to bring or to forgo a derivative consortium claim; *Mendillo* v. *Board of Education*, supra, 246 Conn. 495; there is logical appeal to linking that right to an existing viable claim by the injured spouse. "In a growing number of jurisdictions a separate action for loss of consortium is not permitted, and instead joinder with the principal action on the physical injury is mandatory, in order to reduce the hazard of double recovery. . . . In some joinder is not mandatory but is 'strongly encouraged.' " (Citations omitted.) 2 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 8.9, pp. 553–54 n.14.

The plaintiff nonetheless disputes the propriety of insistence on joinder under any and all circumstances. He relies on a number of cases in other jurisdictions, as well as a statement contained in the Restatement (Second) of Torts § 693 (2) (1965),[7] for the proposition

_____

[7] 3 Restatement (Second), Torts § 693, p. 495 (1965), provides: "Action by One Spouse for Harm Caused by Tort Against Other Spouse

"(1) One who by reason of his tortious conduct is liable to one spouse for illness or other bodily harm is subject to liability to the other spouse for the resulting loss of the society and services of the first spouse, including impairment of capacity for sexual intercourse, and for reasonable expense incurred by the second spouse in providing medical treatment.

"(2) Unless it is not possible to do so, the action for loss of society and services is required to be joined with the action for illness or bodily harm, and recovery for loss of society and services is allowed only if the two actions are so joined."

Comment (g), entitled "Joinder" provides in relevant part: "The invasion of the deprived spouse's interests in the marriage is a separate tort against that spouse, although it is conditioned upon factors that also constitute a

that joinder may be excused if intervening events have made it impossible. See, e.g., *Kubian* v. *Alexian Bros. Medical Center*, 272 Ill. App. 3d 246, 255–56, 651 N.E.2d 231, appeal denied, 163 Ill. 2d 560, 657 N.E.2d 623 (1995); *Rosander* v. *Copco Steel & Engineering Co.*, 429 N.E.2d 990, 991 (Ind. App. 1982). He claims that he cannot be faulted for having failed to join his cause of action to one that his spouse has categorically declined to initiate. Even if we were persuaded that the absence of joinder might be excusable sometimes, we are not so persuaded in the present case.

It is inherent in the nature of a derivative claim that the scope of the claim is defined by the injury done to the principal. The party pursuing a derivative cause of action may have a claim for special damages arising out of that injury, but he may not redefine the nature of the underlying injury itself. In the ordinary physical injury case, a person pursuing a derivative claim may be unable to proceed if the injured spouse's rights were compromised by that spouse's comparative responsibility for the injury. See *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 494; F. Harper, F. James & O. Gray, supra, § 8.9, p. 555. It follows that, in the case of medical

---

tort against the impaired spouse. Despite this, the possibility of double recovery, together with the danger that different juries may return verdicts that are inconsistent or that overlap, must be obviated when possible by requiring that the cause of action of the deprived spouse . . . be joined with that of the impaired spouse for trial. 'Joinder' includes consolidation of suits for trial, as well as the addition of either spouse as a party plaintiff in an action begun by the other. It may, if local procedure permits, allow the addition of a reluctant spouse as a party defendant in an action begun by the other.

"There will be situations in which it is not possible to join the causes of action for the single trial. Thus the impaired spouse's cause of action may have been abated by death. Or the action of the impaired spouse may be barred by a workmen's compensation act, which does not bar the deprived spouse's action. Or the impaired spouse may have settled and released the claim for bodily harm without the knowledge of the deprived spouse. *Or the impaired spouse may simply refuse to sue.* There are no doubt other possible situations. . . ." (Emphasis added.) Id., pp. 497–98.

malpractice, a person pursuing a derivative claim may be barred from bringing suit if the injured spouse gave informed consent to the professional procedure that caused the patient's condition to change.

In the case before us, the record does not disclose the reason for the refusal of the plaintiff's spouse to pursue a malpractice claim against the defendant. The plaintiff claims in his brief—although he did not allege in his complaint—that her disinterest in such litigation is a result of her mental illness. He has not alleged that she lacks the competency to make a decision about whether to sue the defendant. She may believe that it would be better not to engage in litigation with the defendant, or she may believe that the course of medication and treatment that he provided for her caused her no injury. She may believe that, despite setbacks to her ultimate recovery, the benefits of her therapeutic relationship with the defendant are commensurate with the risks that she knowingly assumed about the nature of the treatment required to enable her to improve.

We are not prepared to hold that a derivative cause of action may proceed upon the mere possibility that the plaintiff's spouse may have sustained an injury that resulted from negligent or intentional misconduct on the part of a psychiatrist. None of the cases cited by the plaintiff hang on so gossamer a thread. When § 693 of the Restatement (Second) of Torts excuses joinder that is "not possible," it does so on the premise that "all of the elements of a tort action in the [injured] spouse must exist, including the tortious conduct of the tortfeasor, the resulting harm to the [injured] spouse and the latter's freedom from such fault as would bar a recovery by him or her, as for example, contributory negligence. . . ." 3 Restatement (Second), supra, § 693, p. 497, comment (e). It is precisely that premise that is absent in this case. If a former spouse were permitted

to fill the gap, the spouse would be acting as a self-appointed surrogate for another person who has refused to consent to the surrogacy. A derivative cause of action for loss of consortium does not confer surrogate authority on the noninjured spouse to pursue a claim that does not yet exist.

We conclude, therefore, that the plaintiff cannot pursue an action for loss of consortium in the absence of any basis in the record for a finding that his former spouse was injured as a result of her treatment by the defendant. Accordingly, the trial court properly granted the defendant's motion to strike count five of the plaintiff's complaint.

## II

### DIRECT CAUSE OF ACTION

To sidestep the difficulties inherent in a derivative claim for relief for loss of consortium, the plaintiff also alleged, in count one of his complaint, that the defendant owed him an independent duty of care that he dishonored by his alleged malpractice in the treatment of his former spouse. The trial court rejected that claim on the ground that the plaintiff had failed to allege facts demonstrating that the defendant owed such a duty directly to him. We agree with the trial court.

The plaintiff characterizes his cause of action as follows: he claims that the defendant, in treating the mental illness of the plaintiff's former spouse, knew or should have known that the prescribed course of treatment "would directly affect her marriage" because "marital problems were one of her complaints." Allegedly, the defendant knew or should have known that the plaintiff and his former spouse had previously engaged in marital counseling. As a result of that knowledge, according to the plaintiff, the defendant "was in effect treating the marital res or status which was

enjoyed equally by the plaintiff and the plaintiff's ex-wife." Therefore, the plaintiff argues, the defendant had a duty to the plaintiff, "since he equally enjoyed or possessed the marital res or status." It was foreseeable, the plaintiff maintains, that any negligence in the defendant's treatment of his former spouse "would directly impact upon the marriage relationship that existed between and [was] shared by both parties."

The plaintiff does not allege that the defendant ever undertook to treat the plaintiff either individually or as part of couples' counseling. Even without such a personal professional engagement, the plaintiff claims that he is entitled to pursue a direct cause action by analogy to our decision in *Fraser* v. *United States*, 236 Conn. 625, 674 A.2d 811, cert. denied, 519 U.S. 872, 117 S. Ct. 188, 136 L. Ed. 2d 126 (1996).

In *Fraser*, we delineated the scope of the duty of a psychotherapist to control a psychiatric outpatient to prevent the patient from committing an imminent act of violence against a third person. Id., 625–26, 630–37. To protect the integrity of the therapeutic relationship, we held that a duty to disclose the substantial risk of such an act of violence would arise only if the third person was an identifiable victim or a member of a class of identifiable victims. Id., 632–35. In effect, the plaintiff alleges that he was such an identifiable victim.

The plaintiff is not a victim as that term was used in *Fraser*. In defining the scope of duty of a psychotherapist, we deliberately focused on the centrality of the therapeutic relationship between a mental health professional and his or her patient. Id., 634–35. We declined to jeopardize that relationship except under the most compelling circumstances. Such an exception was warranted, we held, in the event of an imminent risk of serious personal injury to identifiable victims. Id., 634, 637. Third party claimants under *Fraser* must allege

not only identifiability but physical injury. The plaintiff has not alleged that his former wife ever threatened him physically.

Indeed, the considerations of public policy that underlay our decision to limit the scope of a mental health professional's duty of care in *Fraser* provide persuasive grounds for rejecting the plaintiff's claims in this case. The choice of psychotherapist and psychotherapy belonged to the plaintiff's former spouse and not to him. The psychotherapists whom the spouse chose to consult for treatment owed a duty of undivided loyalty to her and not to him.

Our common-law cases have shielded professional decision making from the complaints of third parties when third party intervention carried with it a substantial risk of interference with the primary purpose of the professional consultation. "Considerations of public policy . . . undergird the judicial determination of the scope of duty in the law of negligence . . . ." *Fraser* v. *United States*, supra, 236 Conn. 625, 634. In *Fraser*, we applied that principle in the context of defining the scope of duty of mental health professionals engaged in treating outpatients. In *Zamstein* v. *Marvasti*, 240 Conn. 549, 561, 692 A.2d 781 (1997), we employed it to define the scope of duty of mental health professionals performing sexual assault abuse evaluations of children. To avoid the risk that such evaluations might, in close cases, be affected by the risk of liability "to the very persons whose conduct they might implicate," we held that a mental health professional had no duty to such third persons. Id., 561. Similarly, in this case, when it is foreseeable that marital differences may become a subject for therapeutic analysis, sound public policy counsels that a psychiatrist's treatment of a troubled spouse should not be burdened by accountability to the other spouse.

The principle upon which we rely finds support not only in the law of medical malpractice but also in the law of attorney-client responsibility. In *Krawczyk* v. *Stingle*, 208 Conn. 239, 246, 543 A.2d 733 (1988), we concluded that the imposition of liability to third parties for an attorney's negligent delay in the execution of estate planning documents "would not comport with a lawyer's duty of undivided loyalty to the client." We held that an attorney's duty to his client would be undermined if the attorney were required to undertake estate planning with an eye to safeguarding the interests of potential estate beneficiaries. Id., 246–47. If such third party pressures create an unacceptable risk of a conflict of interest in the execution of a will, it is plain that an even greater risk of improper influence would color a choice among psychiatric therapies if a mental health professional were required to accommodate the interests of the spouse of a patient.

Finally, our decision to preclude the plaintiff from bringing a direct action against the defendant is consistent with the statutory law governing the relationship between psychiatrists and their patients. It is difficult to see how the plaintiff could proceed with such a direct action against the defendant, were he permitted to bring one, without confronting the prohibition on disclosure of psychiatric communications and records contained in General Statutes §§ 52-146d and 52-146e.[8] See *Bieluch*

---

[8] General Statutes § 52-146d provides: "As used in sections 52-146d to 52-146i, inclusive:

"(1) 'Authorized representative' means (A) a person empowered by a patient to assert the confidentiality of communications or records which are privileged under sections 52-146c to 52-146i, inclusive, or (B) if a patient is deceased, his personal representative or next of kin, or (C) if a patient is incompetent to assert or waive his privileges hereunder, (i) a guardian or conservator who has been or is appointed to act for the patient, or (ii) for the purpose of maintaining confidentiality until a guardian or conservator is appointed, the patient's nearest relative;

"(2) 'Communications and records' means all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatrist, or between a mem-

v. *Bieluch,* 190 Conn. 813, 819, 462 A.2d 1060 (1983). Neither his present nor his past relationship with his former spouse would afford him statutory access to this confidential information. He has not alleged that his former wife has waived or would waive her personal right to confidentiality. He similarly has not alleged that

ber of the patient's family and a psychiatrist, or between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility;

"(3) 'Consent' means consent given in writing by the patient or his authorized representative;

"(4) 'Identifiable' and 'identify a patient' refer to communications and records which contain (A) names or other descriptive data from which a person acquainted with the patient might reasonably recognize the patient as the person referred to, or (B) codes or numbers which are in general use outside of the mental health facility which prepared the communications and records;

"(5) 'Mental health facility' includes any hospital, clinic, ward, psychiatrist's office or other facility, public or private, which provides inpatient or outpatient service, in whole or in part, relating to the diagnosis or treatment of a patient's mental condition;

"(6) 'Patient' means a person who communicates with or is treated by a psychiatrist in diagnosis or treatment;

"(7) 'Psychiatrist' means a person licensed to practice medicine who devotes a substantial portion of his time to the practice of psychiatry, or a person reasonably believed by the patient to be so qualified."

General Statutes § 52-146e provides: "(a) All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative.

"(b) Any consent given to waive the confidentiality shall specify to what person or agency the information is to be disclosed and to what use it will be put. Each patient shall be informed that his refusal to grant consent will not jeopardize his right to obtain present or future treatment except where disclosure of the communications and records is necessary for the treatment.

"(c) The patient or his authorized representative may withdraw any consent given under the provisions of this section at any time in a writing addressed to the person or office in which the original consent was filed. Withdrawal of consent shall not affect communications or records disclosed prior to notice of the withdrawal."

he is entitled to disclosure because of a "substantial risk of imminent physical injury" by his former spouse to herself or to him. General Statutes § 52-146f (2).[9] Although likely evidentiary constraints at trial do not, themselves, affect the sufficiency of a stated cause of action, the public policy reflected in these statutes supports our conclusion that the plaintiff has no direct claim for relief under the circumstances of the present case.

The judgment is affirmed.

In this opinion BORDEN, NORCOTT and PALMER, Js., concurred.

BERDON, J., dissenting. In 1979, Justice Bogdanski led a unanimous court in liberating our law from the rusty shackles of the common law.[1] In that year, Justice Bogdanski authored a magnificent majority opinion in *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 408 A.2d 260 (1979), which changed the law in the state of Connecticut[2] in order to permit a cause of action for loss of spousal consortium.[3] Today, my colleagues in the

[9] General Statutes § 52-146f provides in relevant part: "Consent of the patient shall not be required for the disclosure or transmission of communications or records of the patient in the following situations as specifically limited . . .

"(2) Communications or records may be disclosed when the psychiatrist determines that there is substantial risk of imminent physical injury by the patient to himself or others or when a psychiatrist, in the course of diagnosis or treatment of the patient, finds it necessary to disclose the communications or records for the purpose of placing the patient in a mental health facility, by certification, commitment or otherwise, provided the provisions of sections 52-146d to 52-146j, inclusive, shall continue in effect after the patient is in the facility. . . ."

[1] The panel that decided *Hopson* included the author of the majority opinion in the present case.

[2] The court in *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 487, overruled the precedent of *Marri* v. *Stamford Street R. Co.*, 84 Conn. 9, 78 A. 582 (1911).

[3] The Restatement (Second) of Torts, § 693 (1) (1977), contains the following definition of the cause of action for loss of consortium: "One who by reason of his [or her] tortious conduct is liable to one spouse for illness or

majority place a new set of manacles upon this cause of action.

The standard with which we review a trial court's decision to grant a motion to strike is well settled. As the majority acknowledges, we must " 'take the facts to be those alleged in the [plaintiff's] complaint . . . and . . . construe the complaint in the manner most favorable to sustaining its legal sufficiency.' " In the present case, the plaintiff alleged in his complaint that the two defendant mental health professionals negligently subjected his former wife to a course of treatment that (1) caused his marriage to "[break] down irretrievably"; (2) caused him to lose the "love, support and consortium of his wife . . . for the rest of his life"; and (3) caused him to lose "the mother of his children within a marital context . . . ."[4]

This case calls upon us to resolve an issue of first impression in the courts of Connecticut: whether a plaintiff may assert a so-called "freestanding" claim for loss of consortium (i.e., a claim that is not joined with a claim asserted by the injured spouse). In my view, we must answer this question in the affirmative. This result is supported by leading commentators, the overwhelming weight of authority from other jurisdictions, our own opinion in *Hopson*, and—most importantly— the interests of justice.

I agree with my colleagues in the majority that, ideally, a claim for loss of consortium should be joined with

other bodily harm is subject to liability to the other spouse for the resulting loss of the society and services of the first spouse . . . ."

[4] According to the plaintiff's complaint, the defendants did so by negligently committing the following tortious acts: (1) terminating a successful course of treatment for his former spouse's manic depression; (2) initiating a dangerous experimental course of treatment; (3) continuing this latter course of treatment in the face of obvious warning signs that it was causing disastrous consequences; and (4) disregarding alternative forms of treatment "with well-verified efficacy in multiple articles appearing in peer-reviewed medical literature."

the claim asserted by the injured spouse. Nevertheless, there are times when a freestanding action for loss of consortium is appropriate. According to the Restatement (Second) of Torts, a freestanding claim is appropriate when, inter alia, the injured spouse has "simply refused to sue" the defendant. 3 Restatement (Second), Torts § 693, comment (g), p. 498 (1977). This is precisely what happened in the present case.

The Restatement (Second) of Torts disfavors—but does not categorically preclude—freestanding claims for loss of consortium.[5] See id., comment (g). As the New York Court of Appeals recently noted in *Buckley v. National Freight, Inc.*, 90 N.Y.2d 210, 215, 681 N.E.2d 1287, 659 N.Y.S.2d 841 (1997): "A great many States take a position that is consistent with that of the Restatement.[6] Other State courts allow defendants the option of having the action for loss of consortium joined with the action for illness or bodily harm,[7] while still

---

[5] The Restatement (Second), supra, § 693 (2) provides in pertinent part: "*Unless it is not possible to do so*, the action for loss of [consortium] is required to be joined with the [injured spouse's] action for illness or bodily harm . . . ." (Emphasis added.)

[6] "See, e.g., *Schreiner* v. *Fruit*, 519 P.2d 462, 466 (Alaska [1974]); *Hopson* v. *St. Mary's Hosp.*, [supra, 494–95]; *Jones* v. *Elliott*, 551 A.2d 62, 65 (Del. [1988]); *Brown* v. *Metzger*, 104 Ill. 2d 30, 35, 470 N.E.2d 302, 304 [1984]; *Madison* v. *Colby*, 348 N.W.2d 202, 209 (Iowa [1984]); *Deems* v. *Western Md. Ry. Co.*, 247 Md. 95, 115, 231 A.2d 514, 525 [1967]; *Thill* v. *Modern Erecting Co.*, 284 Minn. 508, 513, 170 N.W.2d 865, 869 [1969]; *General Electric Co.* v. *Bush*, 88 Nev. 360, 367–68, 498 P.2d 366, 371 [1972]; *Ekalo* v. *Constructive Serv. Corp.*, 46 N.J. 82, 92, 215 A.2d 1, 6 [1965]; *Nicholson* v. *Chatham Mem. Hosp.*, 300 N.C. 295, 303–304, 266 S.E.2d 818, 823 [1980]; *Butz* v. *World Wide, Inc.*, 492 N.W.2d 88, 91 (N.D. [1992]); *Wilson* v. *Hasvold*, 86 S.D. 286, 293, 194 N.W.2d 251, 255 [1972]; *Moran* v. *Quality Aluminum Casting Co.*, 34 Wis. 2d 542, 558, 150 N.W.2d 137, 145 [1967]; see also *Rosander* v. *Copco Steel & Eng'g Co.*, 429 N.E.2d 990, 992 (Ind. App. [1982]) ('[p]erhaps the best rule . . . is to require joinder')." *Buckley* v. *National Freight, Inc.*, supra, 90 N.Y.2d 215 n.2.

[7] "See, e.g., *Swartz* v. *United States Steel Corp.*, 293 Ala. 439, 445, 304 So. 2d 881, 886 [1974]; *Gates* v. *Foley*, 247 So. 2d 40, 45 (Fla. [1971]); *Diaz* v. *Lilly & Co.*, 364 Mass. 153, 161–63, 302 N.E.2d 555, 560–561 [1973]." *Buckley* v. *National Freight, Inc.*, supra, 90 N.Y.2d 215 n.3.

other States have statutes or rules granting plaintiffs that option.[8] The highest courts in several States have held that joinder is desirable, but not required."[9]

There is good reason for this widespread agreement that, under certain circumstances, it is appropriate to permit a plaintiff to assert a freestanding claim for loss of consortium. In *Hopson*, the unanimous court explained why the interests of justice support a cause of action for loss of consortium in general: "the mental and emotional anguish caused by seeing a healthy, loving, companionable mate turn into a shell of a person is undeniably a real injury." *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 493. This anguish is not diminished by the fact that the injured spouse has declined to sue the tortfeasor. Accordingly, the equitable considerations that underlie the cause of action for loss of consortium apply with full force to cases such as the one presently before us.

The majority claims that dicta in *Hopson* is a "roadblock" to the plaintiff's recovery for loss of consortium. This is simply incorrect. To begin with, dicta can never block a road; the most it can do is suggest that we should travel in one direction or another.[10] For the reasons that I have discussed, the interests of justice counsel us to

[8] "See, e.g., *Stapleton* v. *Palmore*, 250 Ga. 259, 297 S.E.2d 270 [1982]; *Cline* v. *Carthage Crushed Limestone Co.*, 504 S.W.2d 118 (Mo. [1974]); *Hopkins* v. *Blanco*, 224 Pa. Super. 116, 121–23, 302 A.2d 855, 858–59 [1973], aff'd 457 Pa. 90, 320 A.2d 139 [1974]." *Buckley* v. *National Freight, Inc.*, supra, 90 N.Y.2d 215 n.4.

[9] "See, e.g., *Rodriguez* v. *Bethlehem Steel Corp.*, [12 Cal. 3d 382, 407, 115 Cal. Rptr. 765, 525 P.2d 669 (1974)]; *Kotsiris* v. *Ling*, 451 S.W.2d 411, 412–413 (Ky. [1970]); *Reid* v. *Spadone Mach. Co.*, 119 N.H. 198, 199–200, 400 A.2d 54, 55 [1979]; *Layne* v. *Huffman*, 42 Ohio St. 2d 287, 289, 327 N.E.2d 767, 770 [1975]." *Buckley* v. *National Freight, Inc.*, supra, 90 N.Y.2d 215 n.5.

[10] According to Black's Law Dictionary (6th Ed. 1990), dicta "go beyond the facts before court and therefore are individual views of author of opinion and not binding in subsequent cases as legal precedent." Because dicta are "made without argument or full consideration of the point, [they] are not the professed deliberate determinations of the [author]." Id.

ignore any dicta in *Hopson* suggesting that the plaintiff is not entitled to recover for his injuries. In my view, this would be true even if prior holdings of this court had reached the contrary result.[11]

Moreover, any dicta in *Hopson* adverse to the plaintiff's claim is trumped by the court's statement that "the mental and emotional anguish caused by seeing a healthy, loving, companionable mate turn into a shell of a person is undeniably a real injury." Id. If we are going to accord the force of law to any dicta contained in *Hopson*, we should accord it to this resounding note of compassion.[12]

Finally, the majority's reliance upon dicta in *Hopson* is misplaced. The opinion in *Hopson* contains the following dictum: "the consortium claim would be barred when the suit brought by the injured spouse has been terminated by settlement . . . ." Id., 494. My colleagues in the majority are simply incorrect to assert that there is "no viable distinction between precluding a consortium claim when the injured spouse has settled with the alleged tortfeasor and precluding it when the injured spouse, as in this case, has declined altogether to sue the alleged tortfeasor." A tortfeasor settles a claim in order to avoid future liability. For this reason, it is unjust to permit a spouse to ambush a tortfeasor with a subsequent claim for loss of consortium. No similar

[11] As the court of last resort in the state of Connecticut, we have an obligation to read our prior opinions with analytic rigor and reject those that do not comport with the interests of justice. To choose just one example, this is precisely what we did in *Clohessy* v. *Bachelor*, 237 Conn. 31, 675 A.2d 852 (1996). In that case, a unanimous en banc panel of this court—including then Chief Justice Peters—overruled thirty years of express holdings by permitting a bystander to recover for the negligent infliction of emotional distress. Id., 56. Significantly, we did not in *Clohessy* preclude the possibility of a freestanding claim for such a cause of action. Id.

[12] The countervailing policy concern is, of course, efficiency. In my view, we should not sacrifice mental and emotional anguish upon the altar of judicial economy.

injustice obtains in the present case. Significantly, the court in *Hopson* did *not* state that freestanding claims for loss of consortium are categorically impermissible.

Setting to one side our nit-picking over dicta, it could not be any clearer to me that the interests of justice require us to permit a plaintiff to assert a freestanding claim for loss of consortium.

Accordingly, I dissent.