551 S.E.2d 31

June GLOVER, as Executrix/Personal Representative of the Estate of Charles Glover and June Glover Plaintiff Below, Appellant

v.

ST. MARY'S HOSPITAL OF HUNTINGTON, INC., a West Virginia Corporation, and Sirous Arya, M.D., Defendants Below, Appellees

No. 28738.

Supreme Court of Appeals of West Virginia.

Submitted April 4, 2001.

Decided June 22, 2001.

Dissenting Opinion of Justice Davis June 28, 2001.

---

13. Syl. Pt. 2, *South Side Lumber Co. v. Stone Construction Co.*, 151 W.Va. 439, 152 S.E.2d 721 (1967).

**696**

Jane Moran, Esq., Jane Moran Law Offices, Williamson, West Virginia, Attorney for Appellant.

Michael J. Farrell, Esq., Tamela J. White, Esq., Paul V. Morrison, Esq., Farrell, Farrell & Farrell, L.C., Huntington, West Virginia, Attorneys for St. Mary's Hospital of Huntington, Inc.

PER CURIAM:

The appellant, June Glover, appeals the May 24, 2000 order of the Circuit Court of Cabell County, West Virginia, which granted summary judgment to the appellee, St. Mary's Hospital of Huntington, Inc. (St. Mary's). The appellant argues that the issue of whether the hospital may be held jointly liable for the medical malpractice of Dr. Sirous Arya is a question of fact which must be presented to a jury. We find the circuit court's summary judgment order contains insufficient findings of fact regarding whether ostensible agency can be established through the hospital's .advertising campaign and reverse on that basis.

## I.

### FACTS

Charles Glover, now deceased, was employed by Appalachian Regional Hospital in South Williamson, Kentucky, for twenty-four years and ultimately attained the title of hospital administrator. His family physician, Dr. Tuan Chau, treated him for approximately twenty-five years. On October 19, 1994, Mr. Glover made an appointment with Dr. Chau because he was experiencing increasingly intense stomach pain.

Mr. Glover was subjected to testing which showed blood in his stool and an abnormally high white blood cell count. After admitting Mr. Glover to Appalachian Regional Hospital, Dr. Chau referred his patient to a gastroenterologist, Dr. William Cunningham of Huntington Internal Medicine Group, to undergo an endoscopy at St. Mary's Hospital in Huntington, West Virginia. Dr. Chau made the admission arrangements and June Glover transported her husband to Huntington by car on October 19, 1994. Dr. Cunningham was the attending/admitting physician.

On October 20, 1994, Dr. Cunningham performed a colonoscopy on Mr. Glover and discovered a tumor in his colon. The doctor later advised Mr. Glover the tumor was ma-

lignant. Dr. Cunningham told June Glover her husband suffered from a cancerous tumor in his colon and needed surgery. Mr. Glover was still under the effects of sedation at that time. Mr. Glover later gave deposition testimony stating he had no clear recollection of anything that occurred between the time he had this discussion with the doctor and early December 1994 when he awoke from a comatose-like state.

Dr. Cunningham discussed surgeons with June Glover; she stated that she had no preference and told the doctor to choose one who would do a good job. Dr. Cunningham referred Mr. Glover to Dr. Sirous Arya who performed a colon resection. Following surgery, Mr. Glover developed an ischemic colon. A second operation was performed.[1] Further complications arose. By October 30, 1994, the consent forms acknowledge that the patient "cannot sign" and the forms signed thereafter bear his wife's signature. Mr. Glover's gallbladder became gangrenous and had to be removed. He suffered from kidney failure and was placed on dialysis. He developed breathing problems and was placed on a ventilator.

Charles Glover eventually recovered from these complications and was discharged from the hospital on January 19, 1995. His subsequent death on November 15, 1998 followed a diagnosis of metastatic cancer.

Charles and June Glover filed a personal injury action against St. Mary's and Dr. Arya on October 11, 1996. The appellees responded and discovery commenced. However, the litigation was stayed due to bankruptcy proceedings which were progressing in Franklin County, Ohio, by Dr. Arya's insurance carrier, P.I.E. Mutual Insurance Company. Further delay resulted from the recusal of Judge Cummings to whom the case had been transferred from the docket of Judge Ferguson. After Mr. Glover's death, June Glover, as executrix of the estate of Charles Glover, substituted for Charles Glover. The original complaint was amended to allege an additional cause of action, wrongful death. The amended complaint was filed on February 29, 2000.

On March 22, 2000, St. Mary's filed a motion for summary judgment, alleging that no expert testimony was offered to demonstrate the care given the decedent by St. Mary's was negligent. The circuit court agreed, stating that

The plaintiff has no expert witness(es) who will offer opinions critical of the care received by Charles Glover on behalf of St. Mary's. Plaintiff's sole liability expert witness, Dr. Walter Koltun, has no criticisms of the nursing staff at St. Mary's. He was given several opportunities in his discovery deposition to offer opinions critical of St. Mary's and did not. He has testified that he will only be offering testimony, to a reasonable degree of medical probability regarding the care received by Charles Glover from defendant Sirous Ayra, M.D.

The order further states that "[p]laintiff has failed to produce the requisite expert testimony and failed to establish a prima facie case of direct liability as to St. Mary's[ ]" and that "[t]here is no basis in law or fact to establish that Sirous Arya, M.D., was the ostensible agent of St. Mary's Hospital[.]" The court finally determined there was not sufficient evidence for a reasonable jury to find in the appellant's favor and granted summary judgment in favor of the hospital on May 24, 2000. The appellant appeals from this order.

On appeal, the appellant contends a question of fact exists as to whether St. Mary's may be held jointly liable for the malpractice of Dr. Arya. She submits this is so because the hospital held itself out as a provider of services required by Mr. Glover and West Virginia recognizes vicarious liability of hospitals for physicians who provide services in their facilities when the hospitals hold themselves out as a provider of these services. Therefore, says the appellant, the court erred in dismissing the liability of the hospital as a matter of law. The hospital submits that no emerging theory of law was presented by the appellant nor does one exist which,

---

1. The colon resection was performed on October 21, 1994. This was followed by a second surgical procedure on October 28, 1994.

under the facts of this case, warrants an expansion of ostensible liability. In support of this argument, St. Mary's offers facts which show that the hospital played no role in the selection or acceptance of Dr. Arya as the decedent's surgeon.

## II.

### STANDARD OF REVIEW

 "A circuit court's entry of summary judgment is reviewed *de novo.*" Syllabus Point 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). Moreover, " '[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syl. Pt. 3, *Aetna Casualty & Surety Co. v. Federal Ins. Co. of N.Y.,* 148 W.Va. 160, 133 S.E.2d 770 (1963)." Syllabus Point 1, *Fayette County Nat. Bank v. Lilly,* 199 W.Va. 349, 484 S.E.2d 232 (1997). This means that "[t]he essence of the inquiry the court must make is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 61, 459 S.E.2d 329, 338 (1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)).

## III.

### DISCUSSION

 In her amended complaint, the appellant alleges that "Defendants [St. Mary's and Dr. Arya], solely and in concert, owed [her husband] a duty of care from which they negligently deviated in their pre-operative care, in the surgical procedures performed on him and in their post-operative care, and these deviations resulted in permanent injury to him." In her response to the hospital's motion for summary judgment, June Glover stated that she was confident the hospital would fulfill its duty to her husband based, in part, on the extensive advertising campaign St. Mary's displayed. She specifically stated that:

she trusted St. Mary's would not allow [Dr. Arya and the other doctors who provided services to Charles Glover] to treat her husband unless it had verified their competence to do it. Her belief grew in part from the kindness and concern evidence[d] by the nurses and nuns of St. Mary's. The concern they exhibited led her to believe that the image which the hospital projected through their advertising of full service family care was a reliable one.

She attached an affidavit to her response wherein she stated that during the time her husband was in the hospital she was comforted by the kindness shown to her husband and herself by the nurses and other members of the St. Mary's hospital staff. She stated that the staff led her to believe "they were taking care of everything and we did not have to worry." She stated that she received this same impression from the "Healthy Monday" advertising series which she saw "almost every time I watched the news" and from reading the local newspaper.

Also attached to the appellant's response was a videotape which shows examples of the "Healthy Monday" advertising campaign the hospital conducted on television for several years. The campaign covered a wide range of illnesses and health issues including the prevention and treatment of breast cancer and prostate cancer. The format of each "Healthy Monday" commercial is essentially the same. A doctor, nurse, or technician from the appropriate department of the hospital explains the health issue which is the focus of the commercial. The health care provider then discusses potential preventive measures the viewers may be well-advised to heed and treatment for the illness. Each commercial ends with an announcement that a local television station and the hospital are responsible for the advertisement. St. Mary's logo is then projected on the screen.

The "Healthy Monday" campaign is also published regularly in Huntington newspapers. Once again, the St. Mary's Hospital logo is prominently located on each advertisement. The campaign stresses that the hospital contains nationally recognized regional heart and cancer centers. The advertisements list the names of doctors and other

medical professionals who perform specific surgical techniques and other tasks in the hospital. Each advertisement in the series discusses a potential health problem and provides an in-depth explanation of medical assistance offered by the hospital and once again affirms that the "page [is] brought to you by St. Mary's Hospital." The appellant does not allege that St. Mary's advertised on billboards; however, we note that some hospitals attempt to draw business by displaying photographs of physicians and surgeons who practice in their facility on billboards advertising the hospital.

The appellant states that the image St. Mary's projects of itself through its advertising campaign is that of a full-service hospital which is prepared to address a multitude of patient needs, including those of a cancer patient. She states that she believed she could rely on the hospital to accept responsibility for the quality of care her husband received based, in part at least, on the image the hospital chose to project through this advertising campaign.

In conjunction with this issue, we note that:

> Modern hospitals have spent billions of dollars on marketing to nurture the image that they are full-care modern health facilities. Billboards, television commercials and newspaper advertisements tell the public to look to its local hospital for every manner of care, from the critical surgery and life-support required by a major accident to the minor tissue repairs resulting from a friendly game of softball. These efforts have helped bring the hospitals vastly increased revenue, a new role in daily health care and, ironically, a heightened exposure to lawsuits[.]

Steven R. Owens, *Pamperin v. Trinity Memorial Hospital and the Evolution of Hospital Liability: Wisconsin Adopts Apparent Agency*, 1990 Wis. L.Rev. 1129, 1129 (1990). Also,

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

Restatement (Second) of Agency § 267 (1958).

■ The circuit judge had the appellant's allegations of reliance based on the advertising campaign before him. Nevertheless, the court's summary judgment order is devoid of findings of fact regarding the Glovers' reliance on the hospital's advertising campaign. We do not know if the judge even considered this information when he determined Dr. Arya was not the ostensible agent of the hospital and St. Mary's could not, therefore, be held liable for the doctor's negligence. This Court previously stated, "Although our standard of review for summary judgment remains de novo, a circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review. Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed." Syllabus Point 3, *Fayette County Nat. Bank v. Lilly*, 199 W.Va. 349, 484 S.E.2d 232 (1997).

Because the summary judgment order fails to set forth any findings of fact regarding this issue, we reverse and remand this case for thorough evaluation of whether ostensible agency can be established through the hospital's extensive advertising campaign.

Reversed and Remanded.

DAVIS, Justice, dissenting:

(Filed June 28, 2001)

In this medical malpractice action, there are two parties plaintiff: Mr. Glover, who, upon his death, was replaced as a party plaintiff by his estate (hereinafter referred to as "the Estate"), and Mrs. Glover, in her individual capacity. On appeal to this Court, then, the Estate, on Mr. Glover's behalf, is asserting his primary claim, while Mrs. Glover, herself, continues to pursue her claim which is derived therefrom. Only if the Estate succeeds in prosecuting its claims may Mrs. Glover recover on hers. Yet, despite this procedural posture, and the implications thereof, the majority has refused to recognize this distinction and has strayed from the

crucial issue presented for the Court's resolution in this case. The dispositive issue in this case requires a determination of whether an agency relationship existed between St. Mary's Hospital of Huntington (hereinafter referred to as "the Hospital") and Dr. Sirous Arya. If such an agency relationship existed, then the Hospital is liable for any negligence Dr. Arya may have committed in treating the decedent, Mr. Charles Glover. The circuit court found that no evidence was presented to establish an agency relationship and therefore granted summary judgment to the Hospital. Rather than addressing this dispositive issue, though, the majority opinion has reversed and remanded the case for findings of fact on an issue that is wholly irrelevant to the case. I believe this Court should affirm the circuit court's ruling. No evidence was presented by the Estate to show that a genuine issue of material fact exists. Therefore, I dissent.

### The Estate Presented No Evidence that the Hospital's Advertisement Impacted Mr. Glover's Decision to Enter the Hospital or to be Treated by Dr. Arya

The Estate sought to establish liability against the Hospital on the theory that Dr. Arya was an ostensible agent of the Hospital. This Court held in *Cross v. Trapp*, 170 W.Va. 459, 294 S.E.2d 446 (1982), that a hospital is not liable for the negligent acts of a patient's privately retained physician, even though the negligence occurred at the hospital. Syllabus point 7 of *Cross* states, in part, "the hospital where that treatment was performed will ordinarily not be held liable to the patient . . . where the physician involved was not an agent or employee of the hospital during the period in question." *Id.* In order to establish liability against a hospital for the negligence of a doctor, we held in Syllabus point 2 of *Thomas v. Raleigh General Hospital*, 178 W.Va. 138, 358 S.E.2d 222 (1987), that "[w]here a patient goes to a hospital seeking medical services and is forced to rely on the hospital's choice of physician to render those services, the hospital may be found vicariously liable for the physician's negligence." *Cf.* Syl. pt. 1, *Torrence v. Kusminsky*, 185 W.Va. 734, 408 S.E.2d 684 (1991) ("Where a hospital makes emergency room treatment available to serve the public as an integral part of its facilities, the hospital is estopped to deny that the physicians and other medical personnel on duty providing treatment are its agents. Regardless of any contractual arrangements with so-called independent contractors, the hospital is liable to the injured patient for acts of malpractice committed in its emergency room, so long as the requisite proximate cause and damages are present.").

During the proceedings below, the circuit court found, and the majority opinion implicitly concluded, that the Estate failed to present *any* evidence to show that an agency relationship existed between the Hospital and Dr. Arya. Unfortunately, the majority opinion ignored this dispositive finding. Instead, the majority opinion asserted that Mrs. Glover, in her individual capacity, *may* have presented a material issue of fact relating to the Hospital's use of advertisements to entice patients to that specific hospital. To support her position, Mrs. Glover submitted an affidavit stating that the Hospital's advertisement influenced her belief that the Hospital would provide adequate care for Mr. Glover. Concluding that the circuit court's summary judgment order did not address the affidavit, the majority opinion has remanded the case so that the trial court may address the matter in its order.

In this regard, the majority opinion is fundamentally flawed. The majority has failed to distinguish the Estate's primary claim from Mrs. Glover's claim. Mrs. Glover's claim is a derivative claim. That is, the claim presented by Mrs. Glover must stand or fall based upon the disposition of the Estate's case. Courts have recognized that "[i]t is inherent in the nature of a derivative claim that the scope of the claim is defined by the injury done to the principal." *Jacoby v. Brinckerhoff*, 250 Conn. 86, 735 A.2d 347, 351 (1999). *See also Lynn v. Allied Corp.*, 41 Ohio App.3d 392, 536 N.E.2d 25, 36 (1987) ("The derivative cause of action for loss of consortium cannot provide greater relief than the relief permitted for the primary cause of action."). It is generally recognized that when judgment has been granted against the primary injured party, any derivative claim must also fall. *See Sanchez v. School Dis-*

*trict 9–R*, 902 P.2d 450, 453 (Colo.Ct.App. 1995) ("[B]ecause we conclude summary judgment in favor of defendant was properly granted on Heidi's claim, and because DiFerdinando's consortium claim is derivative of Heidi's claim, the consortium claim cannot survive[.]"); *Lynn v. Allied Corp.*, 41 Ohio App.3d 392, 536 N.E.2d 25, 36 (1987) ("Finally, since appellant Janice Lynn's causes of action failed to survive appellees' motion for summary judgment, appellant Luther Lynn's cause of action for loss of consortium must also fail."); *Gregorio v. Zeluck*, 451 Pa.Super. 154, 678 A.2d 810, 815 n. 3 (1996) ("[B]ecause a loss of consortium claim is a derivative cause of action, such a claim will not survive, as we have determined that no injury was established."); *Villacana v. Campbell*, 929 S.W.2d 69, 76 (Texas Ct.App.1996) ("If the decedents' underlying causes of action fail to survive a motion for summary judgment then the derivative actions, being one and the same as the underlying claims, also fail."). Indeed this Court has recognized that "the derivative claims for loss of love, society, comfort, companionship, and services stand or fall with [the primary] claims[.]" *Marlin v. Bill Rich Constr., Inc.*, 198 W.Va. 635, 656, 482 S.E.2d 620, 641 (1996). *Accord Brooks v. City of Weirton*, 202 W.Va. 246, 252, 503 S.E.2d 814, 820 (1998).

Mrs. Glover's affidavit indicating that she *may* have relied on Hospital advertisements in forming her opinion that the Hospital would provide proper care to Mr. Glover is irrelevant in this case. The affidavit could only be used, at best, to support Mrs. Glover's derivative claim. In order to make such evidence relevant, it had to be submitted by the Estate to demonstrate the advertisement's effect on Mr. Glover's opinion of the Hospital's quality of care.[1] Therefore, the trial court was absolutely correct in not addressing the advertisement issue. The Estate never raised this issue as a basis for denying summary judgment to the Hospital.

The logical result of the majority opinion in this case is that West Virginia will be the only State in the nation where an injured spouse can lose his/her primary case, while the spouse with the derivative claim nevertheless prevails. This result is illogical.

For the reasons articulated, I respectfully dissent.

---

1. I am not implying that had the Estate submitted an affidavit regarding the impact of the Hospital's advertisement on Mr. Glover, such evidence would have been sufficient to withstand summary judgment. On the contrary, I do not believe that showing the Hospital displayed advertisements extolling its excellent care creates an ostensible agency relationship between the

Hospital and Dr. Arya. To make such a ruling would result in one of two things: (1) all medical hospitals in the State of West Virginia would stop informing the public of the services they provide, or (2) all hospitals in the State would be held strictly liable for medical malpractice committed on their premises by totally independent doctors.